James R. SMITH, M.D., et al.,
Plaintiffs-Appellants,

v.

NORTHERN MICHIGAN HOSPITALS,
INC., et al., Defendants-Appellees.

No. 81–1513.

United States Court of Appeals,
Sixth Circuit.

Oct. 21, 1982.

Decided March 25, 1983.

Grady Avant, Jr., Long, Preston, Kinnaird & Avant, Detroit, Mich., Cheryl Bailey Estes, John C. Buchanan (argued), Hecht, Buchanan & Cheney, Grand Rapids, Mich., for plaintiffs-appellants.

Gregory L. Curtner (argued), Miller, Canfield, Paddock & Stone, Derek I. Meier (argued), Dykema, Gossett, Spencer, Goodnow & Trigg, Detroit, Mich., for defendants-appellees.

Before LIVELY and KENNEDY, Circuit Judges, and SPIEGEL,* District Judge.

CORNELIA G. KENNEDY, Circuit Judge.

Plaintiff physicians appeal the District Court's grant of summary judgment dismissing their claim that the defendants, Northern Michigan Hospitals, Inc., and the Burns Clinic Medical Center, P.C., had violated sections 1 and 2 of the Sherman Antitrust Act.[1] We affirm the summary judgment on appellants'[2] section 1 and 2 claims involving conspiracy but reverse and remand appellants' section 2 monopolization and attempted monopolization claims against the Burns Clinic for further consideration by the District Court.[3]

On June 1, 1977 the Little Traverse and Lockwood-MacDonald hospitals of Petoskey, Michigan merged to form Northern Michigan Hospitals, Inc. (NMH), one of two defendants in this lawsuit.[4] The second defendant, Burns Clinic Medical Center, P.C. (Burns Clinic), is a multi-specialty professional corporation of which 90% of the doctors and nearly all of the specialists in Petoskey are members. The plaintiffs are independent physicians formerly on the Lockwood-MacDonald staff who became members of the NMH staff with the merger. All of the plaintiffs, except one, practice or had practiced family medicine in Petoskey.[5]

After the merger in 1977, the emergency rooms of Little Traverse and Lockwood-MacDonald were consolidated into one facility at the Little Traverse division of NMH. It is not claimed that the consolidation was undertaken for other than legitimate medical and financial reasons. However, appellants assert that the method of staffing the consolidated emergency facility and hospital practices with respect to referrals of emergency room patients, violated and continues to violate the antitrust laws. Three practices at NMH form the basis of the appellants' complaints.[6]

The appellants first challenge the award of an exclusive contract to the Burns Clinic for the provision of emergency room services. Shortly after the merger, NMH determined, through a staff committee comprised of both Burns Clinic and independent

---

* Honorable S. Arthur Spiegel, United States District Court for the Southern District of Ohio, sitting by designation.

1. *Smith v. Northern Michigan Hospitals, Inc.,* 518 F.Supp. 644 (W.D.Mich.1981).

2. The five plaintiff physicians will be referred to, for convenience, interchangeably as either "plaintiffs" or "appellants."

3. All claims against defendant Northern Michigan Hospitals must be dismissed under our disposition of this case. *See* text, *infra,* at p. 26.

4. One major impetus for this merger was the desire of Little Traverse to expand its facilities. To do so required the approval of the regional Health Systems Agency and the Michigan Department of Public Health. Lockwood-MacDonald at the same time had excess capacity. The Michigan Department of Public Health approved a scaled down version of Little Traverse expansion conditioned on the merger taking place.

5. Three of the five plaintiff physicians left the Petoskey area subsequent to the merger of the two former hospitals. Dr. DePuydt left Petoskey on June 1, 1979, and Dr. Foster moved to Indiana in August of that same year. Dr. Taylor moved his practice to Cheboygan, Michigan on October 17, 1977, prior to any of the allegedly anti-competitive acts now complained of had occurred. His claims must be dismissed on this basis alone.

6. The appellants' theories for recovery have shifted as the case has developed through almost two years of discovery. Initially, the appellants challenged both the merger and the consolidation of emergency rooms. These claims were dropped prior to the District Court's grant of summary judgment.

physicians, that its new consolidated emergency room would be staffed by a small group of full-time physicians specializing in emergency room medicine.[7] To this end, NMH solicited bids from the Burns Clinic, independent physicians in Petoskey, and the "Williams Group," a private company that specializes in providing emergency room staffing. Although only two weeks were allowed for preparation of bids, both the Burns Clinic and the Williams Group submitted proposals. The appellants did not. The exclusive contract was, not unexpectedly, awarded to the Burns Clinic.[8] The appellants contend that this grant of an exclusive contract for the provision of the emergency room services constitutes an unreasonable restraint of trade in violation of section 1. The appellants also urge that this arrangement results from a conspiracy designed to monopolize acute care medicine in the Petoskey market in violation of section 2.

The second practice complained of involves NMH's system of referring uncommitted emergency room patients for follow-up care. Under this system, emergency room patients who do not have or do not prefer a particular doctor in the community are referred, in accordance with the medical judgment of the emergency room physician, to an "on-call" NMH physician in the appropriate area of medical expertise. All physicians on the NMH staff, including the appellants, share rotation on the "on-call" list and theoretically would receive a "fair-share" of those uncommitted patients requiring follow-up care in the area of medicine they practice. The appellants, however, assert that the referral system, while fair on its face, was applied in a discriminatory fashion from 1977 to 1978 before NMH instituted formal auditing. This discriminatory application of the referral system is alleged to have been designed to drive the appellants out of the practice of medicine in Petoskey, in violation of both sections 1 and 2 of the Sherman Act.

Finally, the appellants assert that NMH's so-called "pediatrician rule" violates sections 1 and 2. This rule requires that medical emergencies involving children 14 and younger, who have no physician, be treated by a pediatrician. All of the pediatricians in Petoskey are with Burns Clinic.[9] A similar rule had been in effect at the Little Traverse emergency room since 1955. The rule was, in a manner not clearly disclosed by the record, continued at NMH after merger and consolidation of emergency room services.[10] Appellants allege that the rule was continued at NMH at the behest of Burns Clinic pediatricians with whom the appellants compete directly for the general or "primary" treatment of children. Although there are no pediatricians among the non-Burns Clinic physicians, all of the appellants enjoy or enjoyed pediatric privileges at NMH and assert that they are and were fully qualified to treat many of the children in the emergency room who are automatically treated by Burns Clinic pediatricians.

7. Prior to the merger the emergency room at Lockwood-MacDonald was staffed by various independent physicians including appellants on a rotating part-time basis. The emergency room at Little Traverse was staffed by Burns Clinic under an exclusive contract.

8. The cost differential between the only two competitors, Burns and the Williams Group, was apparently minimal. NMH awarded the contract to the Burns Clinic on the basis of prior favorable experience with the Burns emergency room physicians and a strong NMH staff preference for "in house" staffing.

9. Although the rule does not require treatment by a Burns Clinic pediatrician, that is, in fact, its practical effect. The record reveals that an independent pediatrician has investigated setting up practice in Petoskey but has not done so. He was offered staff privileges but Burns Clinic pediatricians were unwilling to cover for him on weekends or emergencies.

10. The hospital also requires mandatory consultations with a pediatrician for all patients who are admitted with certain medical problems, e.g., Cesarean section and neonatal care infants require an attending physician. The appellants vaguely complain of these rules but fail to specify how such manifestly reasonable medical practice requirements imposed by the hospital are in any way violative of the antitrust laws. Such rules, therefore, play no part in our disposition of the appellants' claims.

Defendants moved for summary judgment shortly before the scheduled trial date. This was two years after the case had been filed and after extensive discovery including depositions from most, if not all, potential witnesses. The District Court found that the appellants had failed to make "even a preliminary showing" that the defendants had "unfairly restrained" trade or conspired to do so and granted summary judgment. In light of the appellants' weak factual proofs and the countervailing medical purposes justifying the practices complained of, the court concluded that no legal basis existed upon which to try the case.

On appeal the appellants assert three grounds for reversal. First, the District Court erroneously failed to apply the more stringent standard for summary judgment appropriate in antitrust actions. Second, the court ignored substantial evidence from which a reasonable jury could infer a conspiracy to eliminate the appellants from acute care practice and to monopolize such services in the Petoskey market. Finally, the District Court erroneously failed to premise its decision on economic analysis and instead accepted the defendants' incantation of medical justifications.

While there is some merit to the appellants' first and third assertions of legal error, we nevertheless find that summary judgment was appropriate on appellants' section 1 and 2 conspiracy claims. Because the District Court's inquiry on appellants' section 2 monopolization and attempted monopolization claims is incomplete, we remand for further development of those claims.

Summary Judgment in Antitrust Litigation

Both the Supreme Court and this Circuit have expressed a clear reluctance to dispose of antitrust litigation on motions for summary judgment. *E.g., Poller v. Columbia Broadcasting System, Inc.,* 368 U.S. 464, 473, 82 S.Ct. 486, 491, 7 L.Ed.2d 458 (1962); *First National Bank of Arizona v. Cities Service Co.,* 391 U.S. 253, 284–90, 88 S.Ct. 1575, 1590–93, 20 L.Ed.2d 569 (1968); *Davis-Watkins Co. v. Service Merchandise,* 686

F.2d 1190, 1197 (6th Cir.1982); *Taylor Drug Stores, Inc. v. Associated Dry Goods Corp.,* 560 F.2d 211, 213 (6th Cir.1977); *Bohn Aluminum & Brass Corp. v. Storm King Corp.,* 303 F.2d 425, 427 (6th Cir.1962). This reluctance to utilize summary judgment dispositions stems from the crucial role that intent and motive have in antitrust claims and the difficulty of proving conspiracy by means other than factual inference. Thus, the Supreme Court in *Poller* stated that:

Summary procedures should be used sparingly in complex antitrust litigation where motive and intent play leading roles, the proof is largely in the hands of the alleged conspirators, and hostile witnesses thicken the plot.

368 U.S. at 473, 82 S.Ct. at 491.

The District Court interpreted language in *First National Bank,* 391 U.S. at 284–90, 88 S.Ct. at 1590–93, as eliminating the distinction between summary judgment in antitrust cases and other civil litigation. We do not believe it can be read so broadly. Rather, the Court merely re-emphasized that even in an antitrust action the party opposing summary judgment may not rest on its pleadings. *See* Fed.R.Civ.P. 56(e). The adverse party must present sufficient evidence supporting its claims to "require a judge or jury to resolve the parties' differing versions of the truth at trial." *First National Bank,* 391 U.S. at 286–90, 88 S.Ct. at 1591–93. *See Norfolk Monument Co., Inc. v. Woodlawn Memorial Gardens, Inc.,* 394 U.S. 700, 701, 703–04, 89 S.Ct. 1391, 1392, 1393–94, 22 L.Ed. 658 (1968) (per curiam). In *First National Bank,* summary judgment was found appropriate because the plaintiff's "total failure to produce evidence tending to show [the defendant's] part in a conspiracy" and the adversity of interests among co-conspirators "conclusively showed" that the allegations were "not susceptible" of the interpretation the plaintiff sought. 391 U.S. at 286–90, 88 S.Ct. at 1591–1593.

To the extent that petitioner's burden-of-proof argument can be interpreted to suggest that Rule 56(e) should, in effect, be read out of antitrust cases and permit

plaintiffs to get to a jury on the basis of the allegations in their complaints, coupled with the hope that something can be developed at trial in the way of evidence to support those allegations, we decline to accept it. While we recognize the importance of preserving litigants' rights to a trial on their claims, we are not prepared to extend those rights to the point of requiring that anyone who files an antitrust complaint setting forth a valid cause of action be entitled to a full-dress trial notwithstanding the absence of any significant probative evidence tending to support the complaint.

*Id.* at 289–90, 88 S.Ct. at 1591–1593.

■ The lesson learned from *Poller* and *First National Bank* is that, although the court should treat antitrust plaintiffs leniently in examining their proofs for issues of fact on a summary judgment motion, those proofs must nonetheless provide some factual basis upon which the conspiracy and intent elements may be reasonably inferred.[11] Once the defendant has adequately rebutted the plaintiff's allegations by establishing legitimate alternative explanations for its conduct which disprove the inferences the plaintiffs seek to draw, then the plaintiffs must come forward with some "significant probative evidence tending to support the complaint." *First National Bank,* 391 U.S. at 290, 88 S.Ct. at 1593.

■ Although the District Court in the present case appears to have misinterpreted the effect of *First National Bank* on summary judgment standards in antitrust litigation, this error does not require reversal. The defendants have provided a number of legitimate alternative explanations for their conduct which adequately rebut the inferences of intent and conspiracy alleged by the plaintiffs. And by affidavit and reference to their depositions they have denied under oath the existence of any conspiracy. The appellants have failed to advance any "significant probative evidence" in response which would provide a sufficient factual basis to withstand summary judgment even under the more lenient standard. We, therefore, reject the appellants' second and more dispositive asserted error, that the District Court ignored substantial probative evidence from which a jury could infer a conspiracy to violate the antitrust laws. Appellants' section 1 claims are treated first.

### Appellants' Section 1 Claims

The three practices of NMH alleged to violate section 1 of the Sherman Antitrust Act are (1) discriminatory application of the NMH's emergency room referral system from 1977 to 1979; (2) continuation of a "pediatrician rule" requiring emergency room patients 14 years old and younger who exhibit medical as opposed to traumatic injury to be seen by a pediatrician; and (3) the grant of an exclusive contract to the

---

11. The Seventh Circuit in *Weit v. Continental Ill. National Bank & Trust Co.,* 641 F.2d 457, 464 (7th Cir.1981), *cert. denied,* 455 U.S. 988, 102 S.Ct. 1610, 71 L.Ed.2d 847 (1982) suggests that the distinction between summary judgment in antitrust litigation versus other civil matters is no longer viable. However, this Circuit, as well as others, has reaffirmed the distinction as recognized in *Poller* and clarified in *First National Bank. E.g., David-Watkins Co. v. Service Merchandise,* 686 F.2d 1190, 1197 (6th Cir.1982); *Taylor Drug Stores v. Assoc. Dry Goods,* 560 F.2d 211, 213 (6th Cir.1977); *National Electrical Contractors Ass'n, Inc. v. National Constructors Ass'n,* 678 F.2d 492, 497 (4th Cir.1982); *Clark v. United Bank of Denver National Ass'n,* 480 F.2d 235, 240 (10th Cir.), *cert. denied,* 414 U.S. 1004, 94 S.Ct. 360, 38 L.Ed.2d 240 (1973); *Battle v. Lubrizol Corp.,* 673 F.2d 984, 987 (8th Cir.1982) (*rehrg. en banc* granted May 21, 1982); *Feminist Women's Health Center, Inc. v. Mohammad,* 586 F.2d 530, 548 (5th Cir.1978), *cert. denied,* 444 U.S. 921, 100 S.Ct. 262, 62 L.Ed.2d 180 (1979). *See also Norfolk Monument v. Woodlawn,* 394 U.S. 700, 701, 703–04, 89 S.Ct. 1391, 1392, 1393–1394, 22 L.Ed.2d 658 (1968) (per curiam); *ALW, Inc. v. United Airlines, Inc.,* 510 F.2d 52, 55 (9th Cir.1975) (expressing reluctance to grant summary judgment in antitrust litigation but nonetheless requiring that the plaintiff come forward with specific factual support upon which the requisite inference of conspiracy may be drawn once the defendant rebuts plaintiff's allegations with probative evidence). *Proctor v. State Farm Mutual Auto. Ins. Co.,* 675 F.2d 308, 335 (D.C.Cir.1982) (the amount of discovery taken weighs against traditional reluctance to grant summary disposition).

Burns Clinic to staff the NMH emergency room.

■ To establish a violation of section 1 of the Act the plaintiff must establish that the defendants combined or conspired with an intent to unreasonably restrain trade.[12] *E.g., Perma Life Mufflers, Inc. v. International Parts Corp.,* 392 U.S. 134, 141–42, 88 S.Ct. 1981, 1985–1986, 20 L.Ed.2d 982 (1968). The appellants have failed to provide a sufficient factual basis upon which to even infer the existence of the prerequisite conspiracy.

(1) The Referral System:

Under the NMH emergency room referral system the emergency room physician who initially examines patients must determine whether follow-up treatment is needed, and if so, what type of care would be medically prudent. Victims of heart disease are presumably referred to heart specialists, broken bones are sent to orthopedists, and more common problems referred to generalists or family practitioners. If a

patient has no local physician, a referral is made to the physician "on-call" on a rotating list of physicians which includes appellants in the appropriate category of medical care as determined by the individual emergency room physician.

■ That the rule is fair on its face is undisputed. However, the appellants claim that they have been deprived of their "fair share" of these referrals through inconsistent application of the rules. We will assume that this may, in fact, have been true. Such deprivation alone, however, would not constitute a violation of section 1. The appellant must provide some factual basis upon which to find that the ostensibly independent referral decisions of the emergency room physicians are part of some concerted design between the two defendants or one defendant and some other conspirator. They have not done so.

■ The appellants have not alleged knowledge much less participation on the

---

**12.** The medical profession is, of course, not exempt from application of the antitrust laws. *E.g., Arizona v. Maricopa County Medical Society,* 457 U.S. 332, 348–50, 102 S.Ct. 2466, 2475–76, 73 L.Ed.2d 48 (1982). *See also National Society of Professional Engineers v. United States,* 435 U.S. 679, 98 S.Ct. 1355, 55 L.Ed.2d 637 (1978); *Goldfarb v. Virginia State Bar,* 421 U.S. 773, 95 S.Ct. 2004, 44 L.Ed.2d 572 (1977). Nevertheless, some professional practices might survive antitrust scrutiny under the rule of reason even though illegal in other contexts. *Maricopa County,* 457 U.S. at 349, 102 S.Ct. at 2475; *National Society of Professional Engineers,* 435 U.S. at 686, 696, 98 S.Ct. at 1362, 1367; *Goldfarb,* 421 U.S. at 788–89 n. 17, 95 S.Ct. at 2013–2014 n. 17.

The Supreme Court has not delineated exactly when or how the special circumstances relevant to learned professions should properly affect application of the antitrust laws. In *National Society of Professional Engineers,* the Court reasserted the basic principle that the focus of inquiry in any antitrust analysis is confined to consideration of "the challenged restraint's impact on competitive conditions." 435 U.S. at 688, 98 S.Ct. at 1363. In response to the defendant engineer's professional ethics and public safety justifications for their restraint on competitive bidding the Court emphasized that "the purpose of the analysis is to form a judgment about the competitive significance of the restraint; it is not to decide

whether a policy favoring competition is in the public interest, or in the interest of the members of an industry. Subject to exceptions defined by statute, that policy decision has been made by Congress." *Id.* at 692, 98 S.Ct. at 1365. *See National Gerimedical Hospital v. Blue Cross,* 452 U.S. 378, 393 n. 19, 101 S.Ct. 2415, 2424 n. 19, 69 L.Ed.2d 89 (1981); *Academy of Clinical Psychologists v. Blue Shield of Va.,* 624 F.2d 476, 485–86 (4th Cir.1980), *cert. denied* 450 U.S. 916, 101 S.Ct. 1360, 67 L.Ed.2d 342 (1981). The Court thereby "intimated" that the professions may adopt ethical rules which regulate and promote competition in a manner appropriate to the profession but may not create rules which have an "overall anticompetitive effect." *Id.* at 686, 696 n. 22, 98 S.Ct. at 1362, 1367 n. 22. *See id.* at 699, 98 S.Ct. at 1369 (Blackmun, J. concurring). Despite this language the Court has apparently not entirely foreclosed consideration of benefits other than enhanced competition—such as quality of service, or protection from malpractice claims—when applying the rule of reason to the professions. *See Maricopa County,* 457 U.S. at 349, 102 S.Ct. at 2475.

In the present case, since there is no evidence to support an inference of the required concerted action, it is not necessary to consider what effect, if any, the defendants' potential medical justifications would have on a rule of reason analysis.

part of NMH in the unfair implementation of this referral. Indeed, when independent orthopedists complained of a lack of referrals early in the life of the system, the hospital immediately responded by conducting spot audits of orthopedic referrals.[13] There is nothing in the present record to indicate that the alleged abuses of the referral system were, if they occurred, anything other than the result of unilateral actions by individuals in the emergency room. The emergency room doctors were not employees of the hospital. Their acts are exclusively those of the Burns Clinic. Close ties between defendants or even the power of one to dominate the other are not, by themselves, sufficient predicates for inferring the existence of a conspiracy to restrain trade. *See Oreck Corp. v. Whirlpool Corp.,* 639 F.2d 75 (2d Cir.1980), *cert. denied,* 454 U.S. 1083, 102 S.Ct. 639, 70 L.Ed.2d 618 (1981).

■ The appellants advance the theory that the emergency room staff, all members of the Burns Clinic, conspired with other specialists in the Burns Clinic who stood to directly benefit from the alleged improper diversion of referrals. Appellant's theory directly contradicts the traditional rule that "[t]wo or more individual officers, directors or agents within a corporation, acting on behalf of that corporation, are considered incapable of conspiring with each other or with their corporation, for § 1 purposes." *Harvey v. Fearless Farris Wholesale, Inc.,* 589 F.2d 451, 455 n. 7 (9th Cir.1979) (citing cases). To find liability on this basis would require approval and application of a limited "independent personal stake" exception to the traditional rule that a corporation cannot conspire with its officers or agents.[14]

See, e.g., Greenville Publishing Co., Inv. v. Daily Reflector, Inc., 496 F.2d 391, 399 (4th Cir.1974); Nurse Midwifery Assoc. v. Hibbett, 549 F.Supp. 1185, 1189–90 (M.D.Tenn. 1982); Hoffman v. Delta Dental Plan of Minn., 517 F.Supp. 564, 571 (D.Minn.1981). Under this exception, a conspiracy may be found to exist between a corporation and its employee by virtue of the employee's independent personal stake in achieving the object of the conspiracy. Without in any way endorsing the merits of this theory in general[15] we hold that no such conspiracy is possible in the present case.

■ There has been no showing to support even an inference of an understanding, explicit or tacit, between the Burns Clinic specialists and the Burns Clinic emergency room staff. Indeed, plaintiffs' own evidence indicates that, if in fact referrals to specialists predominated emergency room referrals, it was because the emergency room doctors believed specialists were better qualified to undertake the follow-up care required. Thus, even if we were to find that the circumstances of this case warranted looking beyond the corporate form of the Burns Clinic, there would nonetheless be insufficient evidence of the required plurality of action and meeting of the minds.

It is true that the income of specialists in the clinic depends, in part, upon each physician's individual billing contribution to the clinic. However, even were we to accept the dubious proposition that such income constitutes a personal independent stake, only the specialists are in a position to benefit from discrimination in referrals in a manner independent of the advancement of

---

**13.** The results of these audits found that only a small number of errors had actually been made.

**14.** Although often referred to as the "intra-enterprise" theory of conspiracy, the exception at issue in this case is distinct from those cases in which conspiracy is alleged to exist among the vertically related corporate subsidiaries of a defendant parent corporation. *See, e.g., Perma Life Mufflers v. International Parts Corp.,* 392 U.S. 134, 141–42, 88 S.Ct. 1981, 1985–1986, 20 L.Ed.2d 982 (1968); *Kiefer-Stewart Co. v. Joseph E. Seagram & Sons,* 340 U.S. 211, 215, 71

S.Ct. 259, 261, 95 L.Ed. 219 (1951). Here the conspiracy is supposed to exist between a single, professional corporation and its member physicians.

**15.** There are rather substantial policy reasons for not adopting such an exception. *See* Note, "Conspiring Entities" Under Section 1 of the Sherman Act, 95 Harv.L.Rev. 661 (1981–82) (summarizing the policy aspects of the intra-enterprise doctrine of corporation conspiracies).

the Burns Clinic as a corporate enterprise.[16] The emergency room physicians cannot, by hospital rule, make self-referrals for follow-up care. Thus, these doctors—the only doctors in this case with the power to wrongfully withhold referrals—do not themselves have any personal stake in the outcome of the alleged conspiracy independent of their stake in the clinic itself. A potential motive on the part of the specialists alone is too speculative a basis upon which to infer an illicit combination.[17] To apply this supposed exception for "independent stake" to the present case would be paramount to allowing the exception to subsume the rule.

■ Appellants also ask that we disregard the corporate structure of the Burns Clinic because it is a professional corporation. Appellants argue that because the Michigan Professional Service Corporations Act [18] provides that an officer, stockholder, agent or employee of such corporation remains personally liable for his or her acts while rendering professional care, doctor members of a professional corporation should be treated as individuals for antitrust purposes. We see no reason to treat professional corporations in any different manner than any other corporation. Group practice by professional corporations is a common method of delivering health care.

Such corporations are lawfully organized.[19] The professional corporation has the same needs as any corporation to have its officers, members and employees engage in concerted activity. As with every corporation, it cannot exist unless its shareholder members can agree among themselves with respect to all aspects of its operation. It is recognition of this need which forms the basis for the rule that since a corporation cannot combine or conspire with itself, the acts of a corporation acting through its directors, officers, and employees are not generally subject to condemnation under section 1. *Greenville Publishing Co.*, 496 F.2d at 399. *See, e.g., Tamaron Distrib. Corp. v. Weiner*, 418 F.2d 137, 138–39 (7th Cir.1969); *Cliff Food Stores, Inc. v. Kroger, Inc.*, 417 F.2d 203, 205–06 (5th Cir.1969); *Chapman v. Rudd Paint & Varnish Co.*, 409 F.2d 635, 642–43 (9th Cir.1969); *Nelson Radio & Supply Co. v. Motorola, Inc.*, 200 F.2d 911, 914 (5th Cir.1952), *cert. denied,* 345 U.S. 925, 73 S.Ct. 783, 97 L.Ed. 1356 (1953); *Allen Organ Co. v. North Am. Rockwell Corp.*, 363 F.Supp. 1117, 1128–29 (E.D.Pa. 1973).

■ Appellants raise the specter of doctors incorporating for the purpose of avoiding the antitrust laws. However, the agreement to form a corporation for that

16. The present case should be distinguished from the *Nurse Midwifery* and *Delta Dental Plan* cases cited by the appellants. In those cases the corporations involved were incorporated associations of independent physician members created to provide health care insurance programs. These corporate entities served purposes other than the actual physical delivery of health care services by member physicians. Each participating physician in the incorporated association maintained the actual practice of their profession independent of that corporate body. Under these circumstances, the independent personal stake of either conspirator is apparent. *Compare Virginia Academy,* 624 F.2d at 479 (finding that "Blue Shield" of Virginia was an agent under the direction and control of its member physicians and not a single entity for antitrust purposes). In contrast, the Burns Clinic in the present case was organized by member physicians to facilitate delivery of specialized medical services in a *group practice.* The interest of each clinic physician is one and the same as the enterprise of which he or she forms a part.

17. The present case is in this sense clearly distinguishable from the *Greenfield Publishing* cases. There, the individual employee held capable of conspiring with his corporation had both an independent personal stake in achieving the conspiracy's object and the power to himself institute the anti-competitive policy for his corporation. However, even were this distinguishing feature absent, it is doubtful that we would follow the analysis in that case. *Compare* with *America's Best Cinema Corp. v. Fort Wayne Newspapers, Inc.,* 347 F.Supp. 328 (N.D.Ind.1972).

18. *See* Mich.Comp.Laws Ann. § 450.226 (West 1967).

19. That such corporations are often organized primarily for tax and pension purposes does not warrant disregarding their corporate structure under Michigan state law. *See Kline v. Kline,* 104 Mich.App. 700, 305 N.W.2d 297 (1981).

purpose would be subject to the scrutiny of the antitrust laws.[20] And the use of a professional corporation for that purpose would run afoul of the attempt to monopolize prohibition of section 2. Moreover, there is no claim that the Burns Clinic was organized for that purpose. Burns Clinic had been in existence, first as a partnership and later as a professional corporation, for many years. It owns its own building in which all the members practice. It is not a mere shell.

### (2) NMH Pediatrician Rule:

■ The second anti-competitive practice of the defendants alleged to be the result of an illegal combination concerns the existence of a "pediatrician rule" at the NMH emergency room. This rule requires that all emergency patients 14 years of age or younger, who have no family physician, must be seen by a pediatrician if they suffer from a medical problem as opposed to a traumatic injury. The Burns Clinic had instituted the rule originally at the Little Traverse emergency room in 1955, and it was apparently adopted or continued by NMH in its present form sometime after merger and consolidation.[21]

The appellants' claim is essentially that the rule unnecessarily eliminates their access to a certain segment of the new patient population treated at the NMH emergency room. Since the appellants have pediatric privileges at NMH they are in direct competition with pediatricians insofar as the routine treatment of children are concerned. Yet, the rule requires that only a pediatrician be called whether or not the individual case is also actually within the acknowl-

edged capabilities of the family practitioners.

We agree with the appellants that the pediatrician rule may in theory[22] restrain competition between family practitioners and pediatric specialists. The appellants have failed, however, to provide any factual basis upon which a jury might find the prerequisite concerted activity for a section 1 violation. Although the record is not clear, it appears that the decision to continue the Little Traverse pediatrician rule was made by the NMH board of directors upon the endorsement of the NMH executive committee and an emergency room subcommittee formed of both Burns Clinic and independent doctors. However, no record of these committee meetings or other evidence has been offered which even implies that continuation of the rule was other than solely the product of NMH's singular efforts to provide appropriate medical care. The appellants have again failed to provide probative evidence tending to infer the existence of a conspiracy sufficient to withstand summary judgment.

### (3) Exclusive Emergency Room Contact:

■ The final act of the defendants alleged to be a concerted effort to unreasonably restrain trade is the award of an exclusive contract to provide emergency services at NMH to a small group of Burns Clinic physicians. Sometime after consolidation of the Little Traverse and Lockwood-MacDonald emergency rooms NMH determined that the consolidated services should be operated by a small group of full-time emergency room specialists. The appellants,

---

**20.** E. Kintner, *Federal Antitrust Law,* Vol. II, § 9.8, pp. 22–23 (1980), discusses and agrees with this proposition.

**21.** The Little Traverse Hospital rule originally required that both medical and trauma cases be referred to a pediatrician and set a higher age limit of 16. With changes in patient load and staffing, however, the rule was modified to its present form sometime prior to the merger of Little Traverse and Lockwood-MacDonald hospitals. Apparently a further informal modification has recently changed the rule so that medical problems are also treated by the emergency

room physician if the patient is admitted after midnight. In that circumstance the pediatrician is called for consultation.

**22.** We say "in theory" because the appellants have not actually presented any evidence as to the number of uncommitted children that are actually admitted to NMH with medical problems within the appellants' range of qualifications. However, finding no evidence to support an inference of conspiracy this deficiency is superfluous to disposition of appellants' section 1 claims.

who did not bid for the contract themselves and were unwilling to work in the emergency room on a full-time basis, claim that the award of an exclusive contract violates section 1 of the Sherman Act. We disagree.

Not all exclusive dealing contracts even by a monopolist are illegal.[23] *See, e.g., Harron v. United Hospital Center, Inc.,* 522 F.2d 1133 (4th Cir.1975), *cert. denied,* 424 U.S. 916, 96 S.Ct. 1116, 47 L.Ed.2d 321 (1976) (exclusive radiology contract); *Brown v. Hansen Publications, Inc.,* 556 F.2d 969, 970 (9th Cir.1977) (exclusive sales agreement imposed on retail outlets for defendant's products); *Export Liquor Sales, Inc. v. Ammex Warehouse Company, Inc.,* 426 F.2d 251 (6th Cir.1970), *cert. denied,* 400 U.S. 1000, 91 S.Ct. 460, 27 L.Ed.2d 451 (1971) (exclusive leasing of facilities on toll bridge in tax free zone). *See also Tampa Electric,* 365 U.S. at 327–29, 81 S.Ct. at 627–629 (exclusive "requirements" contract held lawful under § 3 of the Clayton Act and, *a fortiori,* lawful under section 1 and 2 of the Sherman Act). *But see Hyde v. Jefferson Parish Hospital District No. 2,* 686 F.2d 286 (1982), *petition for cert. filed,* 51 U.S.L.W. 3511 (U.S. Jan. 11, 1983) (No. 82–1034) (analyzing an exclusive contract to provide anesthesia services as a tying arrangement illegal per se under the Sherman Act).[24]

In the present case NMH has only one emergency room through which to provide emergency services to the public. It was required to choose among alternative methods of providing this service in an effective, efficient and medically prudent manner. We agree with the District Court that the defendant NMH chose to staff its consolidated emergency room with full-time specialists in emergency care for undisputedly

legitimate financial and medical reasons. The appellants have failed to present any evidence which would contradict NMH's manifestly legitimate and well-supported justification that full-time specialists trained as emergency room physicians provide medical services superior to those of generalists who rotate on a part-time basis while maintaining full private practices.

The appellants' analogy to the "bottle neck" theory exemplified by cases such as *United States v. Terminal Railroad Association,* 224 U.S. 383, 32 S.Ct. 507, 56 L.Ed. 810 (1912), is unsound. The present case does not involve a group of horizontal competitors whose joint control over some essential facility produces an unreasonable restraint on trade. Rather, NMH, as the coordinator and supplier of an essential but limited public service, stands in a vertical relationship to both the Burns Clinic and the independent physicians in Petoskey. NMH not only may, but also is obliged, to staff its limited facilities in the manner which best serves the public interest. The evidence is overwhelming that it has done just that. There is nothing which would permit a jury to infer that the NMH Board adopted the exclusive contract concept to force appellants out of any market.

The "non-competitive" nature of emergency room services also supports the legitimacy of exclusive contracts for their provision under the antitrust laws. Patients may conceivably choose between two competing hospitals in seeking emergency services, depending upon the proximity of the hospitals and the nature of their injuries. The patient necessarily has only limited choices as to how that service is to be provided, however, once a certain hospital has been selected. Presumably the fees

**23.** Exclusive dealing contracts are analytically similar to cases involving unilateral refusals to deal in that the defendant has, in an exclusive contract, unilaterally determined to deal only with a single entity. *Compare, United States v. Colgate & Company,* 250 U.S. 300, 39 S.Ct. 465, 63 L.Ed. 992 (1919); *Byars v. Bluff City News Co., Inc.,* 609 F.2d 843, 863 (6th Cir.1979), with *Tampa Electric Co. v. Nashville Coal Co.,* 365 U.S. 320, 327–29, 81 S.Ct. 623, 627–629, 5

L.Ed.2d 580 (1961); *Brown v. Hansen Publications, Inc.,* 556 F.2d 969, 970 (9th Cir.1977). However, this category of cases is more helpful in analyzing whether a monopolist's refusal to deal with a potential competitor violates section 2 of the Sherman Act.

**24.** Unlike *Hyde,* 686 F.2d at 289, 293, there is no discernible "tying" arrangement in the present case, nor has one been alleged.

charged by the hospital for various treatments are consistent from one emergency room physician to the next and the choice of treatment a matter left to the medical judgment of the emergency room doctor and hospital policies. In essence it makes virtually no competitive difference to the consuming public in terms of acute care service whether the emergency room is run by full-time specialists or part-time physicians supplementing their regular practices.

To the extent that exclusive contracts for emergency room services may adversely affect the practice of medicine by reducing the number of new patient referrals, that effect is ancillary and uniform among *all* competing physicians on the NMH staff. The system of referrals at the NMH emergency room is, without dispute, a fair means of distributing such new patients among the various physicians on the NMH staff including the appellants. Nor can the appellants legitimately complain that NMH has collusively or unfairly awarded its exclusive emergency room contract to the Burns Clinic. Appellants, by their own admission, failed to submit bids for the emergency room contract and were unwilling to staff the service on the required full-time basis.

Appellants' Section 2 Claims:

The appellants' various assertions of antitrust liability include ill-defined claims of monopolization, attempted monopolization and a conspiracy to monopolize in violation of section 2 of the Sherman Act.[25] The claim of a conspiracy to monopolize fails for the same reason as did the appellants' section 1 claims; there has been no factual basis presented upon which to reasonably infer the existence of a conspiracy in view of the legitimate explanations for defendant's conduct. The appellants' remaining section 2 claims, however, may be established solely by unilateral actions of the

defendants. We agree with the District Court that these remaining section 2 claims are somewhat speculative. However, because the court failed to fully develop the initial factual issues concerning relevant product and geographic markets, summary disposition of appellants' monopolization and attempted monopolization was premature. We therefore, remand the section 2 claim against the Burns Clinic to the District Court for further development.[26]

■ To establish the offense of monopolization a plaintiff must show that a defendant either unfairly attained or maintained monopoly power. *United States v. Grinnell Corp.,* 384 U.S. 563, 570–71, 86 S.Ct. 1698, 1703–1704, 16 L.Ed.2d 778 (1966). Monopoly power consists of "the power to control prices or exclude competition." *Id.* at 571, 86 S.Ct. at 1704.

■ An attempted monopolization occurs when a competitor, with a "dangerous probability of success," engages in anticompetitive practices the specific design of which are, to build a monopoly or exclude or destroy competition. *See Times-Picayune Publishing Co. v. United States,* 345 U.S. 594, 627, 73 S.Ct. 872, 890, 97 L.Ed. 1277 (1952); *Swift & Co. v. United States,* 196 U.S. 375, 396, 25 S.Ct. 276, 279, 49 L.Ed. 518 (1905); E. Kintner, *Federal Antitrust Law,* Vol. II, § 13.1, p. 406 (1980) (citing cases).

■ In order to succeed on either a monopolization or attempt to monopolize claim plaintiffs must establish the relevant product and geographic markets in which they compete with the alleged monopolizers. *See, e.g., United States v. Grinnell Corp.,* 384 U.S. 563, 571–73, 86 S.Ct. 1698, 1704–1705, 16 L.Ed.2d 778 (1966); *Walker Process Equipment, Inc. v. Food Machinery & Chemical Corp.,* 382 U.S. 172, 177, 86 S.Ct. 347, 350, 15 L.Ed.2d 247 (1965); *United*

**25.** 15 U.S.C. § 2 provides: Every person who shall monopolize, or attempt to monopolize, or combine or conspire with any other person or persons, to monopolize any part of the trade or commerce among the several States, or with foreign nations, shall be deemed guilty of a felony. . . .

**26.** The District Court may, of course, still dispose of these claims by summary judgment if after development of the necessary facts it determines that no genuine issues of material fact remain for trial.

*States v. E.I. duPont de Nemours & Co.,* 351 U.S. 377, 395–99, 396 n. 23, 76 S.Ct. 994, 1007–1009, 1008 n. 23, 100 L.Ed. 1264 (1956); *Times-Picayune,* 345 U.S. at 611–12, 73 S.Ct. at 881–882 (1953).

In the present case the District Court granted summary judgment on appellants' section 2 claims because it found that neither defendant enjoyed monopoly power in a market in which appellants compete.

 As to NMH we agree. It is beyond question that NMH does not compete in any fashion with the appellants. Indeed, the appellants have not so alleged.[27] Accordingly, NMH must on remand be dismissed as a defendant to this lawsuit.

 There is, however, no evidence provided by the present record to contradict the appellants' allegations that competition exists between appellants and the Burns Clinic for referral patients from the NMH emergency room. It is true, as the District Court points out, that Burns Clinic provides specialized secondary care medicine almost exclusively. The appellants, on the other hand, are all, except one, family practitioners whose services center on the delivery of primary care. However, there may exist, as the appellants allege,[28] an area of overlap at which these two broad classifications of medicine compete. Appellants, for example, have a wide-range of privileges at NMH for treating medical problems that might also be treated by a Burns Clinic specialist.

If the evidence shows that this area of overlap properly constitutes a relevant discernible market,[29] then a summary disposition of the appellants' monopolization and attempted monopolization claims was inappropriate. The Burns Clinic has an obvious, but legitimately obtained monopoly in Petoskey[30] over the delivery of acute care medicine to the extent it is delivered through an emergency room.[31] If this is a submarket and if the Burns Clinic has utilized this monopoly power unfairly to either exclude competition for emergency room

---

27. NMH provided the District Court with an affidavit disclaiming that any point of competition existed between it and the appellants—all of whom were members of the NMH medical staff. The appellants have provided no contrary evidence.

28. The appellants have admittedly not cogently defined a relevant product market. In their initial complaint appellants alleged a conspiracy designed to eliminate them from the practice of "medicine." In oral arguments before the District Court appellants narrowed their concept of the market to that of "primary care." On appeal the appellants have focused their arguments on "acute medical care." Acute medical care, if a market, must include referrals from the emergency room for follow-up treatment in order to support the appellants' claims. We assume the appellants intended this version of acute care. Appellants have offered no evidence supporting their shifting definitions of the product market. Such a failure is typically fatal to a plaintiff's section 2 claims. *See, e.g., Morton Bldgs. of Neb. v. Morton Bldgs., Inc.,* 531 F.2d 910, 918 (8th Cir.1976). The defendants however, have not presented any probative evidence to contradict the appellants' various asserted markets. For this reason in reviewing the grant of summary judgment we will assume that product market alleged which would prove most supportive of the appellants' respective claims.

29. This area of overlap, if it exists, might conceivably be as narrow as "acute care referrals" or "acute care referrals for follow-up primary care." *See, e.g., E.I. duPont de Nemours & Co.,* 351 U.S. at 395–96, 76 S.Ct. at 1007–1008; *Byars v. Bluff City News,* 609 F.2d at 852–53. *See also Borden, Inc. v. FTC,* 674 F.2d 498, 508–09 (6th Cir.1982) (*petition for cert. filed,* 51 U.S.L.W. 3150 (Aug. 24, 1982) (No. 82–328) (discussing submarket analysis). We intimate no view on whether such a market in fact exists as distinct from the broader classification of primary care and specialized secondary care. It is an issue which must be considered first by the District Court, however, prior to final disposition of the appellants' section 2 claims. Similarly, the District Court must consider the relevant geographic dimensions of this market in evaluating these claims.

30. The record again does not reveal whether Petoskey is the relevant geographic market for acute care medicine assuming that acute care is a discernible product market. The Burns Clinic may, of course, present contrary evidence to the District Court.

31. The clinic's monopoly is one created by a contract held lawful in this opinion. *See supra,* at 954-956. It is not, of course, a necessarily permanent one in that NMH controls its existence through competitive bidding.

referrals or in an attempt to gain monopoly power in primary care[32] or the "overlap" market alleged to exist by the appellants, liability under section 2 might be established. The District Court must, therefore, fully consider the issue of relevant market prior to final disposition of appellants' section 2 claims.[33]

Economic Analysis of Antitrust Claims Against the Professions

 The appellants also argue that the District Court erred by failing to premise its decision on economic analysis. While the appellants' argument accurately states the law, the appellants mischaracterize the District Court's opinion. The court premised its judgment on appellants section 1 claims primarily upon the appellants' failure to provide any factual basis upon which to reasonably infer the prerequisite concerted action. The court also emphasized that the defendants had offered substantial medical justifications to contradict any potential inferences of either concerted action or an intent to restrain trade. In this the District Court was perfectly correct. In the absence of legitimate explanation for conduct a fact finder may be warranted in drawing an inference that the anti-competitive conduct resulted from concerted activity and an improper motive.[34] However, such an inference is not permissible when there is persuasive evidence of legitimate purposes or other explanation which negates that inference. *See, e.g., Times-Picayune,* 345 U.S. at 627, 73 S.Ct. at 890; *Davis-Watkins Co.,* 686 F.2d at 1199. For this purpose the medical justification is highly relevant. To the extent that the District Court's opinion may be read to imply that economic analysis of an antitrust claim is unnecessary once a defendant in a

learned profession proffers justifications it must be rejected. Such a proposition would be contrary to basic anti-trust principles, *see, e.g., National Society of Professional Engineers,* 435 U.S. at 688, 696 n. 22, 98 S.Ct. at 1367 n. 22; *Virginia Academy,* 624 F.2d at 485–86, and plays no part in our disposition of this case.

AFFIRMED in part, REVERSED in part, and REMANDED for further proceedings in accordance with this opinion.

---

**32.** The Burns Clinic apparently maintains, contrary to the District Court's assertions, primary care services in direct competition with the appellants. This fact must also be evaluated by the District Court on remand.

**33.** Since NMH's pediatrician role was presumably endorsed and adopted by the hospital and there is no evidence of actual Burns Clinic input much less responsibility in its adoption, it should play no part in the decision on remand.

**34.** This is equally true in the context of section 2 monopolization and attempted monopolization claims. *See, e.g., Times-Picayune,* 345 U.S. at 627, 73 S.Ct. at 890. In the present case, however, it is difficult to perceive what justification there could be for totally excluding the appellants—all qualified by hospital rules—from receiving their fair share of emergency room referrals. This matter is, of course, left for development by the District Court.