784 F.2d 746
 54 USLW 2478, 1986-1 Trade Cases 66,967
 William R. BEACH, d/b/a Beach's Discount Sewing Centers and
William R. Beach and Carroll Sauer, a partnership,
d/b/a Beach's Discount Sewing Center,
Newport, Plaintiffs-Appellants,
v.
The VIKING SEWING MACHINE COMPANY, INC., Tri-State Viking
Distributors, Inc., and Robert G. Kramer, d/b/a
Kramer's Sewing Machine Centers,
Defendants-Appellees.
 No. 84-3255.
 United States Court of Appeals,
Sixth Circuit.
 Argued May 3, 1985.
Decided Feb. 27, 1986.
 
 Kenneth G. Hawley (argued), Waite, Schneider, Bayless & Chesley Co., L.P.A., D. Arthur Rabourn, Cincinnati, Ohio, for plaintiffs-appellants.
 Irving Harris (argued), Jerome Metz, Porter, Wright, Morris, Arthur, David Horn (argued), John K. Rose, John S. Stith, Frost & Jacobs, Cincinnati, Ohio, for defendants-appellees.
 Before JONES and KRUPANSKY, Circuit Judges, and PHILLIPS, Senior Circuit Judge.[1]
 KRUPANSKY, Circuit Judge.
 
 
 1
 Plaintiffs appealed the district court's entry of a directed verdict in favor of defendants after a lengthy trial on plaintiffs' antitrust claims. Plaintiffs alleged violations of Secs. 1 and 2 of the Sherman Act, 15 U.S.C. Secs. 1 and 2; Sec. 73 of the Wilson Tariff Act of 1894, 15 U.S.C. Sec. 8; Sec. 2 of the Robinson-Patman Act, 15 U.S.C. Sec. 13; and the Ohio Valentine Act, Ohio Rev.Code Secs. 1331.01, 1331.04. The complaint in essence charged a per se and/or a rule of reason conspiracy between the defendants to fix and maintain retail prices of Viking sewing machines in violation of Sec. 1 of the Sherman Act and other statutes.
 
 
 2
 At the final pretrial conference of the instant case, plaintiffs declared that they did not intend to pursue any rule of reason Sec. 1 Sherman Act claims or any Sec. 2 Sherman Act monopolization claims as charged in the second, third, and fourth claims of their complaint and that they intended to pursue only the per se restraint of trade Sec. 1 Sherman Act charges alleged in the first claim of their complaint, together with the per se violations alleged pursuant to the Wilson Tariff Act and Ohio Valentine Act in the fifth and seventh claims of their complaint.[2] Plaintiffs' decision to pursue only per se Sec. 1 Sherman Act violations was reaffirmed in their arguments before the district court on defendants' motion for directed verdict wherein plaintiffs conceded that they had not pursued their second, third, and fourth claims, alleging, inter alia, Sec. 1 Sherman Act rule of reason violations, during the trial. Accordingly, this court does not address the sufficiency of plaintiffs' evidence under a rule of reason analysis with respect to the statutes in issue.
 
 
 3
 Trial of the case commenced on February 7, 1984. Defendants moved for a directed verdict at the close of plaintiffs' evidence, which motion was granted in the form of an oral bench ruling by the district judge on March 6, 1984 and formalized by an order entered in accordance therewith on March 8, 1984. Plaintiffs on March 26 filed a timely notice of appeal from the district court's March 8 order granting the directed verdict and the final judgment pursuant thereto. On March 29, the district court entered a comprehensive memorandum opinion in support of its directed verdict.
 
 
 4
 A review of the record discloses the following facts. Plaintiff William Beach (Beach) owned and operated discount sewing machine dealerships in Cincinnati and Cheviot, Ohio and Florence, Kentucky. He and a partner, plaintiff Carroll Sauer (Sauer), owned and operated Beach's Discount Sewing Center in Newport, Kentucky. Defendant Viking Sewing Machine Co., Inc. (Viking), with its principal offices in Minneapolis, imported Viking sewing machines, which were manufactured by Husqvarna, a Swedish company. In the greater Cincinnati tri-state area (Ohio, Kentucky, and Indiana), it marketed Viking sewing machines exclusively through Tri-State Viking Distributors, Inc. (Tri-State). Defendant Robert Kramer (Kramer) owned and operated Tri-State. Kramer also owned and operated three retail sewing machine centers, one in Cincinnati, one in Florence, Kentucky, and one in Montgomery, Ohio, and licensed use of his own name (Kramer) at another store.
 
 
 5
 Tri-State had been Viking's exclusive distributor in the northern Kentucky, southwestern Ohio, and southeastern Indiana area for many years. It had sole responsibility to recruit and appoint authorized dealers to market Viking machines in the allocated geographical region. Tri-State sold the machines to the dealers for resale. From 1972 to the time of trial, Kramer had complained to Viking that his prices were threatened by price-cutters within the area of his distributorship. He urged Viking to assist him in eliminating unfavorable competition.
 
 
 6
 Plaintiff Beach testified that on several occasions between 1976 and 1982, he sought to be licensed as a Viking dealer. He testified that his initial meeting with Kramer was concluded when he, Beach, refused to discontinue the sale of Singer sewing machines, a competing line of merchandise, in return for a Viking dealership. Beach also testified that a second meeting with Kramer ended for essentially the same reason when he insisted on continuing his business operations as a multi-brand dealer. Beach met with Kramer on at least two or three additional occasions to no avail.
 
 
 7
 Beach contacted Viking directly in 1980 by letter requesting a dealership. Viking replied that Tri-State was its exclusive distributor in the area and referred the inquiry to Kramer. Kramer advised Beach that no additional Viking dealers were needed in the area at that time. Beach again wrote to Viking in 1981 to request a dealership and to complain that Kramer had created a monopoly. Viking again referred him to Kramer and Tri-State, stating that "we do not sell directly to retail stores in [the greater Cincinnati] area. Tri-State Viking is an independent entity, and we do not, and will not, attempt to control to whom it sells." Viking consistently and without exception referred all requests for dealerships in the area, from all sources, to Tri-State.
 
 
 8
 Plaintiffs at trial urged that Kramer and Viking refused to deal with Beach because Kramer feared that Beach would market Viking sewing machines at discount prices thereby forcing Kramer to reduce his prices. Plaintiffs argued that Kramer and Viking conspired to maintain retail prices and to limit competition in Tri-State's area.
 
 
 9
 Plaintiffs' retail outlets discounted their merchandise to consumers by twenty to thirty percent to maintain a high sales volume. Competing Singer and Bernina sewing machines accounted for forty to forty-five percent of Beach's volume. Beach's efforts to establish an alternate supply of Viking machines from other dealers were also essentially unsuccessful. Beach was, however, successful in acquiring a very limited number of Viking machines from dealerships outside of Tri-State's territory through an involved practice of transshipping.[3] As a result of his difficulties, he encouraged customers to purchase competing Pfaff, Elna, and Bernina machines instead of Viking and testified that he believed that those machines were superior to Viking. When Beach was successful in acquiring Viking machines through transshipping, he sold them at substantial discounts to undercut Kramer's prices. Plaintiff Sauer testified that customers were reluctant to purchase Viking machines from plaintiffs even when limited numbers were available because plaintiffs were not authorized dealers and consequently were unable to perform major warranty services.
 
 
 10
 When Kramer became aware of the transshipping of Viking machines into Tri-State's territory by other dealers to Beach for resale, he persuaded Viking to notify its distributors of Viking's policy against the practice of transshipping. A 1973 Viking policy statement provided: "Viking sewing machines shall not be shipped into another Viking Dealer's territory. Viking sewing machines shall not be shipped to non-Viking dealers or distributors in any part of the world." Viking stressed that it would refuse to sell to dealers who deviated from the policy.
 
 
 11
 Defendants asserted that plaintiffs did not qualify for dealerships because they did not provide the necessary pre-sale, point-of-sale, and post-sale services demanded of all Viking dealers. Although plaintiffs maintained that they were full service dealers and would comply with "reasonable" marketing requirements, they refused to honor all of the commitments imposed by Viking upon its dealers. Plaintiffs did not stock a full line of any of the name brand merchandise that they sold and would not agree to inventory a full line of Viking sewing machines. Plaintiffs could not demonstrate all models of any brand of sewing machines that they did stock and would not have been capable of demonstrating all models of the Viking machine. Plaintiffs did not offer sewing classes, demonstrate products at homeshows or fairs, or conduct promotions programs in conjunction with area schools. These sales activities were integral to Viking's marketing program. Plaintiffs were also incapable of providing full post-sale warranty services which were vital to Viking's marketing strategy.
 
 
 12
 The district court determined that plaintiffs had failed to present sufficient evidence to permit a reasonable trier of fact to conclude that a per se price fixing conspiracy under Sec. 1 of the Sherman Act had been demonstrated against defendants Viking and Tri-State. The court stated that Viking's actions with respect to Beach were consistent with Viking's overall marketing strategy of delegating responsibility to an exclusive distributor and of discouraging transshipping. It characterized the restrictions as vertical restraints that fostered interbrand competition by encouraging active promotional activity by dealers. The court alternatively held that there was insufficient evidence of concerted activity between Viking and Tri-State to support a per se Sec. 1 Sherman Act violation.[4]
 
 
 13
 The district court's decision to grant a directed verdict was proper initially because there existed no substantial evidence of a conspiracy between Viking and Tri-State. In Monsanto Co. v. Spray-Rite Service Corp., 465 U.S. 752, 104 S.Ct. 1464, 1469, 79 L.Ed.2d 775 (1984), the Supreme Court emphasized that Sec. 1 "requires that there be a 'contract, combination ... or conspiracy' between the manufacturer and other distributors in order to establish a violation." The Court distinguished unilateral action, recognizing that a manufacturer had the right to deal or refuse to deal with whomever it desired. Id. (citing United States v. Colgate & Co., 250 U.S. 300, 307, 39 S.Ct. 465, 468, 63 L.Ed. 992 (1919)). The Monsanto decision teaches that a conspiracy is not proved by the mere termination of a dealership in response to complaints by other dealers. Id., 104 S.Ct. at 1470-71. The Court in that case noted that it was necessary for a manufacturer and its distributors to discuss marketing strategy and prices, especially where there was a program of nonprice restrictions in place. Id. at 1470. The Monsanto Court concluded that "something more than evidence of complaints is needed. There must be evidence that tends to exclude the possibility that the manufacturer and nonterminated distributors were acting independently." Id. at 1471. The antitrust plaintiff "should present direct or circumstantial evidence that reasonably tends to prove that the manufacturer and others 'had a conscious commitment to a common scheme designed to achieve an unlawful objective.' " Id. (quoting Edward J. Sweeney & Sons, Inc. v. Texaco, Inc., 637 F.2d 105, 111 n. 2 (3d Cir.1980), cert. denied, 451 U.S. 911, 101 S.Ct. 1981, 68 L.Ed.2d 300 (1981)). In Monsanto, the manufacturer had pressured certain of its distributors, in response to complaints by other distributors, to impose and adhere to a suggested retail price structure. Id. The Supreme Court found that sufficient evidence was presented to the jury to enable it to exclude the possibility of independent action by the manufacturer. Id., 104 S.Ct. at 1473.
 
 
 14
 In the present case, there was insufficient evidence to prove that Viking was not acting independently. The successive denials of a dealership to plaintiffs were solely the decisions of Tri-State. The inquiries that plaintiffs directed to Viking were referred to Tri-State. Viking never appointed a dealer in Tri-State's area. It consistently referred all inquiries concerning dealerships to Tri-State. As the district court noted, there was no need to inquire beyond the existence of the exclusive distributorship arrangement to determine whether plaintiffs should have been authorized as Viking dealers. Courts have long recognized that it is not illegal "for a manufacturer to enter into contracts that provide particular customers exclusive rights to sell [its] product in designated geographical areas." Cernuto, Inc. v. United Cabinet Corp., 595 F.2d 164, 167 (3d Cir.1979) (citation omitted). There was no evidence that plaintiffs' applications were refused by Viking for any reason other than the prior appointment of an exclusive distributor. Kramer was delegated independent, absolute discretion in authorizing dealerships within his exclusive merchandising territory. The record did not reflect any evidence of a concerted effort between Viking and Kramer that could support the conspiracy pursued by plaintiffs before the trial court.
 
 
 15
 Plaintiffs argued that Viking's action in providing Kramer with sewing machine serial numbers permitted Kramer to discover the avenues of transshipping and constituted sufficient evidence of concerted activity. The argument is without merit because Viking acted pursuant to its established uniform policy of discouraging the transshipping of its products. It would be improper for the court to infer that alleged culpable conduct of the defendants resulted from concerted activity when the record disclosed affirmative evidence of legitimate purposes that negated the conclusory assertions advanced by the plaintiffs. See Smith v. Northern Michigan Hospitals, Inc., 703 F.2d 942, 949, 956 (6th Cir.1983). There was no evidence that Viking's actions were attributable to a concern over losing Kramer as a customer and not to its desire to pursue its own expressed policy against transshipping.
 
 
 16
 The district court also determined that Tri-State rejected Beach's applications for reasons that were not solely price related. The Supreme Court in Monsanto emphasized that while concerted action to set prices was per se illegal, concerted activity imposing nonprice restrictions should be examined by applying the rule of reason criteria, which required a weighing of the relevant circumstances of a particular case to determine whether an alleged restrictive practice constituted an unreasonable restraint on competition. Monsanto, 465 U.S. 752, 104 S.Ct. 1464, 1469. See also Continental T.V., Inc. v. GTE Sylvania, Inc., 433 U.S. 36, 97 S.Ct. 2549, 53 L.Ed.2d 568 (1977). This court concludes that the criteria for awarding an authorized dealership and the policy against transshipping were not sufficiently demonstrated to have been price related and would, therefore, have been cognizable for antitrust purposes only as Sec. 1 Sherman Act rule of reason violations if at all.[5]
 
 
 17
 This circuit's decision in Davis-Watkins Co. v. Service Merchandise Co., 686 F.2d 1190 (6th Cir.1982), cert. denied, 466 U.S. 931, 104 S.Ct. 1718, 80 L.Ed.2d 190 (1984), is apposite to consideration of the case at bar. In Davis-Watkins, this court upheld the district court's dismissal on summary judgment of per se antitrust claims of price stabilization, group boycott, and horizontal market division under Sec. 1 of the Sherman Act raised by the defendant therein on cross-appeal. The defendant, as with plaintiffs here, had attempted to obtain Amana microwave ovens for retail sale in its stores. The exclusive distributor in the particular area in question was Davis-Watkins, which had an agreement with Amana that it would sell only to authorized dealers within the distributor's exclusive area and would require assurances from its dealers that they would sell only to retail customers. Amana's policy, analogous to Viking's policy in the instant case, was to market a product which product incorporated pre-sale, point-of-sale, and post-sale services to be furnished by its dealers. These services included displays of its full line of products, advertisements, in-store demonstrations, trained sales staff, warranty and repair service, and cooking schools. The Davis-Watkins court recognized that such commitments, while reducing intrabrand competition, promoted interbrand competition by enhancing the manufacturer's product relative to its competitors' merchandise. Id. at 1195. The court noted that "restraints imposed by a manufacturer or supplier upon its distributors or retailers, so-called 'vertical' restraints, are generally found to be potentially beneficial to interbrand competition. Analysis of vertical restraints, therefore, requires the application of the rule of reason." Id. at 1196 (citing Sylvania, 433 U.S. 36, 97 S.Ct. 2549, 53 L.Ed.2d 568 (1977)). The court held that departures from rule of reason analysis must be based on the economic effect of the restrictions--a showing of a "pernicious effect on competition or that they lack any redeeming virtue." Id. at 1198 (quoting Sylvania, 433 U.S. at 58-59, 97 S.Ct. at 2561-2562).
 
 
 18
 The Davis-Watkins court found insufficient evidence of a horizontal boycott to justify departure from rule of reason analysis of vertical nonprice restraints. It reasoned that, although Amana had received complaints about price cutting from other dealers, there was no evidence that it did not act "otherwise than consistent with its market strategy." Id. at 1199. The defendant in Davis-Watkins, like plaintiffs in the case at bar, did not offer a full line of products or provide all of the pre-sale, point-of-sale, and post-sale services that Amana demanded of its dealers. The court concluded that such commitments served to discourage the "free rider,"[6] namely the dealer who benefited from promotional and other activity of other dealers without himself promoting or servicing Amana products, and to potentially increase interbrand competition. Id. at 1199-1200. Accordingly, the court in Davis-Watkins endorsed the application of the rule of reason to the facts in issue to the exclusion of a per se analysis and affirmed the district court order of summary judgment.
 
 
 19
 Although this court has already concluded that plaintiffs' evidence established that the challenged dealership requirements at issue here were imposed independently by Viking, the court is constrained to further observe as indicated above that the marketing demands were not price related and thus were inappropriate for per se antitrust evaluation. While Viking's marketing requirements, like many other nonprice vertical restraints, may have manifested some indirect effect on price, the policies did not amount to resale price maintenance and were not without redeeming qualities for antitrust purposes. The policy against transshipping and requirement of dealer services assured that the dealer was accessible to the customer and promoted the products effectively. The pre-sale, point-of-sale, and post-sale services required of Viking dealers were remarkably similar to those for which the Davis-Watkins court determined that per se treatment was inappropriate. In sum, the instant marketing strategy imposed by defendants acting independently of each other stimulated interbrand competition and was not motivated solely by price considerations. The district court properly concluded that plaintiffs' evidence failed to support per se Section 1 Sherman Act, Wilson Tariff Act and Ohio Valentine Act antitrust violations alleged in counts one, five and seven respectively of plaintiff's complaint and accordingly directed verdicts on those counts.
 
 
 20
 As an alternative basis for its decision, the district court found that plaintiffs presented insufficient evidence of damage that resulted from their inability to acquire a Viking dealership. In Elder-Beerman Stores Corp. v. Federated Department Stores, Inc., 459 F.2d 138, 148-49 (6th Cir.1972), this court rejected plaintiff's contention that a department store lost customers and experienced an overall reduction in sales volume because it was unable to stock particular brands of merchandise for sale to retail customers. The Elder-Beerman court observed: "The plaintiff's theory virtually ignored the necessity for proof that comparable alternative brands were not available." Id. at 148. The court stressed that the plaintiff's "desire" for a specific brand of merchandise was insufficient "to establish that such brand was thereby rendered unique." Id. at 149. The court in Elder-Beerman held that opinion testimony of plaintiff's employees concluding that the store could have done a greater volume of business if it had offered the specified brands for sale was insufficient to prove damages. The Elder-Beerman rationale is dispositive of the damages issue in the case sub judice. This court agrees with the district court that plaintiffs failed to prove the uniqueness of Viking sewing machines. Plaintiffs did not demonstrate that comparable alternative brands were unavailable. To the contrary, Beach testified that the Elna, Pfaff, and Bernina brands were of comparable price and superior in quality to the Viking brand. Although Beach testified that some customers would refuse to purchase Viking machines when they were advised that Beach was not an authorized dealer, Sauer speculated that plaintiffs could have sold 200 Viking machines per year if they had been authorized dealers. Sauer also testified that he could and did persuade customers to purchase other brands of sewing machines. Plaintiffs' proof of damages was insufficient to withstand a motion for directed verdict.
 
 
 21
 In sum, this court concludes that plaintiffs failed to support their per se charges because: (1) the evidence was insufficient to support the existence of a conspiracy between Viking and Kramer since it failed to establish that defendants had a conscious commitment to a common scheme designed to achieve an unlawful objective; (2) Viking's marketing practices were not demonstrated to have been motivated solely by considerations of price, but were not price related in nature, thus negating the existence of a per se Sec. 1 Sherman Act violation on the basis of defendants' refusal to deal with plaintiffs; and (3) there was no evidence to prove damage suffered by plaintiffs.
 
 
 22
 Accordingly, the decision of the district court is AFFIRMED.
 
 
 
 [1]
 The Honorable Harry Phillips died on August 3, 1985, after this case was argued. Judge Phillips did not participate in the disposition of this case
 
 
 [2]
 Additionally, the trial court had earlier dismissed plaintiffs' Robinson-Patman Act claim by order dated October 19, 1982
 
 
 [3]
 Transshipping in the context of the case at bar was a procedure whereby Beach purchased Viking sewing machines from distributors outside of Tri-State's exclusive geographical marketing territory for transshipment to Beach for resale in Tri-State's marketing territory at prices below those retail prices offered by duly authorized Viking dealers within Tri-State's exclusive marketing area
 
 
 [4]
 Plaintiffs conceded in the district court that they alleged conspiratorial conduct only between Viking and the Kramer defendants. They did not allege a conspiracy among the Kramer defendants themselves
 
 
 [5]
 The court reiterates that plaintiffs pursued only their per se claims in the district court and on this appeal, thus negating any necessity at this juncture to examine the merits, if any, of plaintiffs' position advanced by the second, third, and fourth claims of the complaint which were abandoned prior to the commencement of trial
 
 
 [6]
 A "free rider" is a discounter which does not incur the expenses of pre-sale, point-of-sale, and post-sale services imposed upon the manufacturer's dealers and is thereby capable of undercutting the authorized dealers' price