Shawky A. HASSAN, M.D., PhD., et al., Plaintiffs,

v.

INDEPENDENT PRACTICE ASSOCIATES, P.C., et al., Defendants.

Civ. A. No. 85–CV–40008–FL.

United States District Court, E.D. Michigan, S.D.

Oct. 28, 1988.

Marc L. Fleischaker, James Kidney, Kevin C. Boyle, Arent, Kintner, Fox, Plotkin & Kahn, Washington, D.C., Bennett S. Engelman, Houston, Tex., for plaintiffs.

Alan G. Gilchrist, Dan Ellis Champney, Frimet, Bellamy, Gilchrist, Detroit, Mich., Clifford E. Barnes, Washington, D.C., Michael James, Flint, Mich., David A. Ettinger, Honigman, Miller, Schwartz & Cohn, Detroit, Mich., W.L. Mueleman, III, Neal & Lengauer, Flint, Mich., for defendants.

## MEMORANDUM OPINION AND ORDER

NEWBLATT, District Judge.

Before the Court are defendants' Motion for Summary Judgment and plaintiffs' Motion In Limine. Because the issues dealt with by these motions are essentially the same, they shall be dealt with together. The Court GRANTS defendants' Motion for Summary Judgment, which thereby renders plaintiffs' motion MOOT. Judgment

shall be entered for defendants. The following summarizes the Court's findings.

1. Plaintiffs' claim of price fixing in violation of the Sherman Antitrust Act has no merit, first, because plaintiffs lack standing, having failed to show that they have sustained the type of injury that the Sherman Act contemplates and, second, that the defendant IPA constitutes a legitimate joint venture that imposed no unreasonable restraint of trade.

2. Plaintiffs' claim of illegal group boycott has no merit, first, because the plaintiffs were expelled from defendant IPA pursuant to a policy of cost containment, which motive the Court finds *pro*competitive; second, because the defendants did not possess the requisite market power to effect a violation of the Act; and third, because plaintiffs failed to show that IPA's actions against them had the necessary deleterious effect on the availability of allergy treatment for the population as a whole to constitute a violation of the Act.

3. Plaintiffs' claim under the Michigan Restraint of Trade Act, Count III of the Complaint, fails for the reasons stated relative to the federal antitrust claims.

4. Plaintiffs' claim of tortious interference with economic advantage, Count IV of the Complaint, fails because plaintiffs have not shown that the defendants acted illegally, which showing is a predicate element of this claim.

## A. FACTS

Plaintiffs Shawky Hassan and Fikria Hassan are allergists who practice through the Allergy & Asthma Center, P.C., a professional corporation wholly owned by the Drs. Hassan. Defendant Independent Practice Associates, P.C., (IPA) is an organization of physicians and osteopaths who provide medical care to subscribers of Genesee Health Care, Inc., doing business as Health Plus of Michigan (Health Plus), a state licensed, federally-qualified health maintenance organization (HMO).[1] On January 8, 1985, plaintiff filed a four-count complaint against defendants. Counts I and II alleged that IPA violated the price-fixing and group boycott prohibitions contained in § 1 of the Sherman Act, 15 U.S.C. § 1. Plaintiffs allege that a reimbursement system constitutes *per se* illegal price fixing, and that IPA's participation in plaintiffs' separation from IPA and the group's subsequent refusal to readmit the doctors, constitute an illegal group boycott.[2]

### 1. Nature of IPA and Health Plus

IPA is the corporation through which the group of doctors that treat patients who subscribe to Health Plus practice. It is owned by the physicians who comprise the group (IPA by-laws). Health Plus, the HMO insurance contractor here, was formed by the Genesee County Medical Society in 1979. Its Board of Directors is made up of subscribers, the public and physicians.[3] Health Plus is funded by subscribers who pay a fixed premium per month. With this money, Health Plus pays service providers, such as IPA, on a computed basis and also a fixed amount per member per month. IPA members are paid primarily on a fee-for-services basis, which the IPA determines according to a set maximum fee schedule. (Landgraf Aff. ¶¶ 4–5.) Thus, Health Plus will pay IPA physicians no more than what the fee schedule provides.

Defendants concede that IPA exists only to serve Health Plus patients. Because Health Plus faces competition, as defend-

---

1. Defendant Van Duyne was IPA's medical director during the relevant periods.

2. Count III is under the Michigan Restraint of Trade Act, the relevant portions of which track the Sherman Act. Count IV alleges tortious interference with economic advantage.

3. The parties are in dispute whether IPA controls the majority of the Health Plus Board. Although plaintiffs maintain that IPA members and persons "selected by them" control Health Plus; they point to nothing in the record to support this. Defendants, on the other hand, offer the affidavit of Gerald Landgraf, president of Health Plus and a defendant, which states that this is not true. (Landgraf Aff. at 3.)

Moreover, Landgraf is Executive Director of both IPA and Health Plus which are apparently run out of the same office. In fact, plaintiffs contend that IPA has no staff. Instead, Health Plus "details" people to perform tasks for IPA.

ants maintain, IPA must contain costs. This fact has resulted in actions the consequence of which have included denying physicians' applications for membership and terminations or resignations of physicians. (Smally Dep. 38 and 55.)

When Health Plus reimburses IPA members, it withholds 12% of the amount for IPA in a "risk withhold" fund, which is later used to compensate Health Plus and IPA, if utilization projections for the year are inaccurate. In other words, the "risk withhold" fund is paid to IPA physicians if IPA possesses sufficient funds to pay it. There have been occasions when payments have been delayed. (Landgraf Aff. ¶ 10; June 11 Dep. at 101.) However, IPA has stated that it is committed to "full compensation" of its members. (IPA Bulletin at 1 (July, 1980.)) [4]

The IPA maximum fee schedule, which IPA physicians must agree to accept,[5] was initially determined by schedules submitted by members as well as information ("relative value indices") about fees in areas that IPA did not operate. (Landgraf Aff. ¶ 7.) [6] Defendants maintain that physicians have never been allowed to determine reimbursement levels applicable to their given specialities because "neither IPA's Finance Committee, which initially passes on proposed maximum reimburse-ment levels, nor its Board of Directors, is dominated by any one specialty." (Landgraf Aff. ¶¶ 7–8.) Defendants' brief at 7. Defendant Landgraf has testified that most physician input on reimbursement levels is ignored. (Landgraf Aff. ¶ 8, June 11 Dep. at 62.)

## 2. Health Plus Growth

Health Plus has experienced substantial growth since 1979 and its patient market share is 20 percent of the population in the area of Genesee—Lapeer—Shiawassee counties.[7] In 1982, when plaintiffs left IPA, Health Plus treated only about 8 percent of the area (Leonard Dep.Ex. 42), whereas it has been estimated Blue Cross applied to 65–70 percent of the third-party business in the three-county area. (Oleson Dep. at 23).[8] Health Plus must compete with other HMOs and insurers in providing health care coverage.[9] There is no evidence that IPA physicians cannot also belong to other such organizations.[10]

Defendants contend that they face a competitive market. For example, they contend that the largest portion of Health Plus's membership is represented by General Motors (GM) employees. In order to obtain the GM business, defendants must compete on an annual basis by obtaining both GM and UAW approval as an authorized insurer and then, further, convince the employees to choose the Health Plus program. Thus, GM, the union, and the workers must be satisfied as to both price charged and benefits offered. (Landgraf Dep. 16–20.) Defendants maintain that as a result of the competition, they have lowered their rates since 1983, while simultaneously increasing the benefits. (Landgraf Aff. ¶ 4.)

## 3. Plaintiffs' Experience With IPA

Plaintiffs joined IPA in 1979, and until October of 1981, they were the only allergy

---

4. Under IPA's "PPG" system, primary care physicians who face additional risks, belong to particular subgroups. (Landgraf Aff. ¶¶ 10–11.)

5. Physician members must accept IPA's set maximum fee as payment in full, (absent co-pays) for service. 1981 *IPA Provider Agreement* at 1.

6. Changes are made based on a formula applied to most procedures. (Landgraf June 11, Dep. at 61–2.)

7. Plaintiffs' economic expert identified the relevant geographic market as Genesee, Lapeer and Shiawassee Counties. Plaintiffs' supplemental response to defendants' second interrogatories and requests for production of documents at 9–10. *See also* Leonard Dep.Ex. at 42.

8. Wrisley Oleson is director of Health Plus Marketing Studies. (Dep. at 2.)

9. Landgraf Aff. at 13; June 11 Dep. at 12–13. Lynk Aff. at 4; Oleson Dep. at 16–17. Blue Cross and Blue Shield of Michigan and its subsidiary, Greater Flint HMO, is apparently the biggest provider and competitor offering both commercial and HMO coverage. (Landgraf June 11 Dep. at 12–13.)

10. However, Dr. Ronald Smaller, the former president of IPA, has testified that "assuming the existence of Health Plus and IPA, unless a physician were an IPA member eligible to treat Health Plus subscribers, he might have difficulty finding patients."

specialists to provide such service to Health Plus subscribers. In 1980, a review of billing records revealed a high incidence of lab tests performed by plaintiffs and prompted the IPA's Care, Quality and Cost Committee to request justification for those tests from plaintiff Shawky Hassan. Moreover, the Committee began setting guidelines for allergy testing which prohibited routine testing. (Landgraf June 11 Dep. at 106–07; Mackenzie Dep. at 188 and Ex. 2.) Further, in October of 1981, an IPA survey of allergy testing procedures indicated that plaintiffs performed far more tests than two other specialists,[11] (Tanhehco Dep.Ex. 11) and a review of patient charts failed to satisfy the IPA that the Hassans' level of testing was justified.[12]

Plaintiffs maintain that the review was of no more than 30 patient charts and that the review panel, except for Drs. Troutman and Mackenzie, left without reaching a conclusion. (Carter Dep. at 30.) Plaintiffs contend that the remaining physicians told plaintiff Shawky Hassan that if he did not resign from IPA, he would be terminated and that shortly after the visit, Health Plus sent out a notice that subscribers could no longer see the Drs. Hassan.

Defendants maintain that the Hassans' practice has declined in recent years but that this began before they left IPA and that the decline was across the board, including Health Plus and non-Health Plus patients as well as referrals from IPA and non-IPA physicians.[13] Several IPA physicians testified that they ceased referring nonHealth Plus patients to plaintiffs because of patient complaints as well as overuse of tests. (Dykewicz Dep. at 25; Van Duyne Dep. at 56–6; Smally Dep. at 36, 305–06.) Moreover, defendants contend that referrals from non-IPA physicians declined almost as fast as referrals from IPA physicians. (Lynk Aff. at 19.)

In August of 1983, the Hassans applied to IPA on behalf of their newly-established Urgent Care Family Clinic to provide emergency care to IPA members. (Oleson Dep. Ex. 5.) The IPA Credentials Committee met with plaintiff Shawky Hassan on September 2, 1983 and the matter was deferred. In the interim, plaintiffs applied on their own behalf for readmission to IPA. On January 6, 1984, all of plaintiffs' applications were denied without explanation. (Van Duyne Dep.Ex. 16.) The Hassan Clinic lost money and, in 1985, it was closed. (S. Hassan Dep. 85, ¶ 51.)

## B. PRICE FIXING

Count I of plaintiffs' complaint alleges that defendants' reimbursement system violates § 1 of the Sherman Act's prohibition against horizontal agreements among competitors to fix prices.[14] The Supreme Court has consistently held that any combination formed for the purpose and with the effect of raising, depressing, fixing, pegging or stabilizing the price of a commodity in interstate or foreign commerce is illegal *per se* under § 1 of the Sherman Act. *United States v. Socony–Vacuum Oil Co.*, 310 U.S. 150, 60 S.Ct. 811, 84 L.Ed. 1129

---

**11.** One of these was Dr. Cookingham, an allergist, who applied for IPA membership in October of 1981. The other was Dr. Tanhehco.

**12.** The IPA physicians who participated in the investigation indicated that plaintiffs overused certain diagnostic tests, performing them on a routine rather than selective basis and that there were a number of substantial deficiencies in plaintiffs' records. (S. Hassan Dep.Exs. 12, 13; Mackenzie Dep. at 48; Van Duyne Dep. at 64.)

The IPA testing policy is that "[a]llergy testing is not a set of routine procedures and all diagnostic studies done should be selectively chosen ... with specific indications." (Mackenzie Dep.Ex. 2.) Plaintiff Shawky Hassan has testified, however, that "for all allergic patients who are first seen a nasal smear eosinophilin is helpful in determining the initial therapy and subsequent progress or failure of treatment." (S. Hassan Dep. at 594.) *See also* S. Hassan Dep. at 489 and 492.

**13.** Defendants contend that the Hassans' cash revenues declined faster before leaving IPA than afterward. (Lynk Aff. at 19.)

**14.** Section 1 of the Sherman Act, 15 U.S.C. § 1, states in pertinent part:

Every contract, combination in the form of trust or otherwise, or conspiracy, *in restraint of trade or commerce* among the several States, or with foreign nations, is declared to be illegal.

(1940).[15] Pursuant to this rule, the Court has condemned agreements among competitors to fix prices, *Catalano, Inc. v. Target Sales, Inc.*, 446 U.S. 643, 100 S.Ct. 1925, 64 L.Ed.2d 580 (1980), as well as vertical resale price maintenance agreements, *Kiefer–Stewart Co. v. Joseph E. Seagram & Sons*, 340 U.S. 211, 71 S.Ct. 259, 95 L.Ed. 219 (1951). Price fixing involving the sale of services is just as unlawful. *Goldfarb v. Virginia State Bar*, 421 U.S. 773, 95 S.Ct. 2004, 44 L.Ed.2d 572 (1975).

In this case, plaintiffs maintain that IPA established a schedule of fees for services to which its competitor/members agreed to adhere and this is a *per se* violation of Section 1.

### 1. STANDING

■ Defendants first argue that plaintiffs' price-fixing claims must be dismissed because plaintiffs have not been injured sufficiently to confer standing on them to assert such a claim.[16] In *Brunswick Corp. v. Pueblo Bowl–O–Mat, Inc.*, 429 U.S. 477, 97 S.Ct. 690, 50 L.Ed.2d 701 (1977), the Supreme Court held that plaintiffs must prove more than an injury causally linked to an illegal act. Rather, they must

> prove *antitrust* injury, which is to say injury of the type the antitrust laws were intended to prevent and that flows from that which makes defendants' acts unlawful. The injury should reflect the anticompetitive effect either of the violation or of anticompetitive acts made possible by the violation.

(Emphasis added.)

**15.** "[F]or over forty years this Court has consistently and without deviation adhered to the principle that price fixing agreements are unlawful *per se* ... and that no showing of so-called competitive abuses or evils which those agreements were designed to eliminate or alleviate may be interposed as a defense." *Id.* 310 U.S. at 218, 60 S.Ct. at 842. *See also Arizona v. Maricopa County Medical Society*, 457 U.S. 332, 347, 102 S.Ct. 2466, 2474, 73 L.Ed.2d 48 (1982) ("We have not wavered in our enforcement of the *per se* rule against price fixing.") (Emphasis added.)

**16.** Standing to sue for an antitrust injury is granted under Section 4 of the Clayton Act, 15

429 U.S. at 489, 97 S.Ct. at 697. (Emphasis in original.)

In *Associated General Contractors of California, Inc. v. California State Council of Carpenters*, 459 U.S. 519, 535, 103 S.Ct. 897, 907, 74 L.Ed.2d 723 (1983) the Court stated that the standing inquiry revolved around "the plaintiff's harm, the alleged wrongdoing by the defendants and the relationship among them." [17] The Court rejected a blanket rule, setting forth factors that should be analyzed instead. Those factors were recently repeated by the Sixth Circuit in *Southaven Land Co. v. Malone & Hyde, Inc.*, 715 F.2d 1079, 1086 (6th Cir.1983).

> The "factors" expressly identified as such in the text include, *inter alia*, (1) the causal connection between the antitrust violation and harm to the plaintiff and whether that harm was intended to be caused; (2) the nature of the plaintiff's alleged injury including the status of the plaintiff as consumer or competitor in the relevant market; (3) the directness or indirectness of the injury, and the related inquiry of whether the damages are speculative; (4) the potential for duplicative recovery or complex apportionment of damages; and (5) the existence of more direct victims of the alleged antitrust violation. 103 S.Ct. at 908–13.

Thus, the common thread is an injury particular to antitrust-defined circumstances.

However, the analysis differs depending on whether a consumer or competitor is challenging the illegal conduct.

A significant element of the § 4 "standing requirement" is the nature of plain-

U.S.C. § 15 (1982), which states in pertinent part that "[a]ny person who shall be injured in his business or property by reason of anything forbidden in the antitrust laws may sue ... and shall recover threefold the damages by him sustained...."

**17.** The label "antitrust standing" has traditionally been applied to some elements of his injury ... the focus of the doctrine of 'antitrust standing' is somewhat different from that of standing as a constitutional doctrine. Harm to the antitrust plaintiff is sufficient to satisfy the constitutional standing requirement of injury in fact, but the Court must make a further determination whether the plaintiff is a proper party to bring a private antitrust action.

tiff's alleged injury either as a customer or participant in the relevant market:

> [T]he Sherman Act was enacted to assure customers the benefits of price competition, and our prior cases have emphasized the central interest in protecting the economic freedom of participants in the relevant market.

*Id.* (quoting *Associated,* 459 U.S. at 538, 103 S.Ct. at 908).

Here, defendants contend that plaintiffs, as competitors and not consumers, have not suffered an antitrust injury merely because they seek to obtain reimbursement higher than defendants' allegedly anticompetitive levels.[18] Thus, defendants maintain, the plaintiffs suffer an injury only to the extent that IPA reimbursement was at lower, more competitive levels. Accordingly, the "anticompetitive effect" actually worked to correct the very evil that the laws against price fixing seek to deter.[19] Moreover, defendants maintain that if IPA's reimbursement was too high, the plaintiffs would not have benefited because consumers would go to a competitor who kept prices lower.[20]

Plaintiffs maintain that defendants misconstrue their theory. They seek only damages for the time they were in IPA, arguing that defendants' price fixing drove them from the market in that the IPA reimbursement were at lower-than-competitive levels. Clearly, such a theory has been recognized by the Supreme Court. As the Court in *Maricopa,* 457 U.S. at 346–48, 102 S.Ct. at 2474–75 indicated, maximum price-fixing agreements were no less prohibited than those for minimum prices.[21] Moreover, plaintiffs assert that the price-fixing went beyond Health Plus patients in that IPA attempted to fix prices generally for medical services in Flint by reminding its members that they should charge Health Plus patients no more than their nonHealth Plus patients. (Troutman Dep.Ex. 5; Van Duyne Dep. 62–63; Troutman Dep. 164).[22]

This argument must fail. Plaintiffs are essentially arguing that the IPA member physicians have conspired to be paid too little by setting the maximum reimbursement below competitive levels to drive the plaintiffs in this case out of the market. Unlike *Matsushita,* 475 U.S. 574, 106 S.Ct. 1348, 89 L.Ed.2d 538, in which plaintiffs alleged a conspiracy to monopolize the

---

*Id.* 459 U.S. at 535 n. 31, 103 S.Ct. at 907 n. 31.

**18.** In plaintiffs' complaint at paragraph 24, the plaintiffs allege that the "fees fixed by IPA were consistently below those fees which plaintiffs and other allergy specialists in the area had routinely charged non-[Health Plus] patients...."

**19.** Defendants rely on *Kartell v. Blue Shield of Mass.,* 749 F.2d 922, 930 (1st Cir.1984), *cert. denied,* 471 U.S. 1029, 105 S.Ct. 2040, 85 L.Ed.2d 322 (1985) for the proposition that the Sherman Act was intended to protect consumers against prices that were too high, not too low. *Kartell,* however, denied the plaintiff's antitrust claims because no horizontal conspiracy was involved—only a single firm, Blue Shield which was providing the medical service. In dicta, the Court indicated additional reasons to deny court supervision of a Blue Shield/physician price bargain. One of these was because the prices at issue were too low and that when that was the case, "courts at least should be cautious to condemn too speedily—an arrangement that ... appears to bring low price benefits to the consumer." *Id.* at 931.

**20.** Defendants rely on *Matsushita Elec. Ind. Co. v. Zenith Radio,* 475 U.S. 574, 583, 106 S.Ct.

1348, 1354, 89 L.Ed.2d 538, 550 (1986) which stated, in dicta, that:

> [Plaintiffs, competitors, cannot] recover damages for any conspiracy by petitioners to charge higher than competitive prices in the American market. Such conduct would indeed violate the Sherman Act ... but it would not injure [plaintiffs]: as [defendants,] competitors, respondents stand to gain from any conspiracy to raise the market price....

That does not mean, however, that consumers could not challenge the conduct because they had presumably been injured. *See also Tom v. Hawaii Dental Service,* 606 F.Supp. 584 (D.Haw. 1985).

**21.** *See also Kiefer–Stewart, supra* 340 U.S. at 213, 71 S.Ct. at 260 ("agreement[s] among competitors to fix maximum resale prices of their products ... no less than those to fix minimum prices, cripple the freedom of venders and thereby restrain their ability to sell in accordance with their own judgment."); ABA ANTITRUST SECTION, ANTITRUST LAW DEVELOPMENTS, at 33, (2d Ed.1984).

**22.** This is not established by the record. IPA members were merely encouraged and not obligated to do this under their agreement. (Van Duyne Dep. 62.)

American market by means of pricing below the market level,[23] these plaintiffs offer no such plausible story or reason. In fact, if all IPA reimbursement levels are too low, and not just allergy reimbursement levels, all the IPA members have succeeded in achieving is harm to themselves.[24] In *Matsushita, supra* at 587, 106 S.Ct. at 1357, 89 L.Ed.2d at 552, the Supreme Court held that if, as in this case, a plaintiff's claim makes no economic sense, the plaintiff must "come forward with more persuasive evidence to support their claim than would otherwise be necessary."

Plaintiffs have failed to make such a showing. In order to determine whether, as alleged, IPA has conspired to drive respondents out of the relevant market by setting reimbursement levels below the competitive level—and to counter the inference that plaintiffs' argument makes no economic sense—plaintiffs must indicate what the competitive level is; that is, what the appropriate measure of cost is. *Matsushita*, 475 U.S. 574, 106 S.Ct. 1348, 89 L.Ed. 2d 538. However, plaintiffs have failed to indicate what that competitive level is. In fact, plaintiffs' economist testified that he had no evidence on this issue.

Q. Are you aware of any evidence that any of the maximum fees contained in the IPA maximum fee schedules have been at a significantly higher competitive level?

A. I don't know what the competitive level is.

Q. So the answer is no, you have no evidence.

A. I have none, personally.

Q. You say you have none personally. Are you aware of anyone involved in this case having any?

A. I am not aware of what evidence there may be.

(Leonard Dep. at 880.)

Thus, plaintiffs have failed to show antitrust injury or standing, and as such, their claim of price-fixing under Section 1 of the Sherman Act must be dismissed.

*2. Does a Per Se Rule Against Price–Fixing Apply in this Case?*

■ Defendants argue in the alternative that assuming plaintiffs did suffer antitrust injury, the *per se* rule against any kind of price-fixing does not apply in this case because IPA's actions do not involve agreement between competitors to control decisions about reimbursement. Rather, defendants maintain that IPA's actions were taken for reasons of efficiency not covered by the *per se* label.

*a. Is There an Agreement Between Competitors?*

Defendants first contend that there has been no agreement between competitors to fix reimbursement for allergy testing because persons with allergy testing privileges and competency did not control decision-making with regard to allergy testing reimbursement levels; no specialty group controlled reimbursement decisions.[25] In

**23.** The Supreme Court in *Matsushita* stated:
  For purposes of this case, it is enough to note that respondents have not suffered an antitrust injury unless petitioners have conspired to drive respondents out of the relevant markets by (i) pricing below the level necessary to sell their products, or (ii) pricing below some appropriate measure of costs.

**24.** If plaintiffs were to allege that defendants set allergy reimbursement levels too low in order to drive plaintiffs out of the market with the aim of giving that business to primary care physicians, that theory is contradicted by the fact that plaintiffs were immediately replaced by two other allergists, Drs. Cookingham and Tanhehco.

**25.** Defendant Landgraf stated in his affidavit at paragraphs 8 and 9 that "no specialty group determined maximum fees applicable to procedures performed by specialists because no specialty group comprised a majority on either the IPA Finance Committee or IPA's Board of Directors."

Defendants rely on *Vogel v. American Soc. of Appraisers*, 744 F.2d 598 (7th Cir.1984), which stated, in dicta, that plaintiff had failed to satisfy his burden of showing that the agreement complained of was an agreement among competitors as most of the members of the Society were not gem appraisers (as was plaintiff), and that of the few gem appraisers only four were located in Illinois. That case is not applicable here for the reasons indicated below.

Moreover, the other case cited by defendants, *Pennsylvania Dental Assoc. v. Medical Services Assoc. of Penn.*, 745 F.2d 248 (3d Cir.1984) is inapplicable. In that case, the 32–member

essence, defendants are also claiming that plaintiffs can only complain of price fixing in the allergy market in which they compete. *Southaven*, 715 F.2d at 1083.

The Court agrees with plaintiffs that the facts do support an agreement between competitors. In *Maricopa*, 457 U.S. at 348, 102 S.Ct. at 2475, the Supreme Court was faced with a nonprofit foundation composed of medical doctors who, by a majority vote, set maximum fees limiting the amount that they could recover as payment for services. The Court held that:

> In this case the rule is violated by a price restraint that tends to provide the same economic rewards to all practitioners regardless of *their skill, their experience, their training,* or *their willingness to employ innovative and difficult procedures* in individual cases. Such a restraint also may discourage entry into the market or deter experimentation and new developments by individual entrepreneurs. It may be a masquerade for an agreement to fix uniform prices, or it may in the future take that character.

In *Maricopa*, the Court apparently assumed that there was a conspiracy; as plaintiffs point out, the individual practitioners in *Maricopa* included both general practitioners and specialists. The same thing happened in *Goldfarb v. Virginia State Bar*, 421 U.S. 773, 95 S.Ct. 2004, 44 L.Ed.2d 572 (1975), in which the Court found illegal a fee schedule that fixed the prices for title examinations. The Court made no distinction as to whether the committee setting the fee was controlled by lawyers who did title searches. Similarly, there is no reason to distinguish this case from the above. Health care providers do set the fee reimbursement in this case.[26]

Board of Directors which had the responsibility for setting pricing decisions, included only two dentists. The rest were non-dentists. The court stated that "[h]ealth care providers do not constitute a majority on the Board." *Id.* at 258. Thus, there was no conspiracy. This case may well support plaintiffs rather than defendants.

26. As mentioned above, the IPA Finance Committee, which is appointed by the IPA Board of Directors, sets the fees. (Troutman Dep.Exs. 5, 6 and 7; Landgraf Aff. at 31.) Both these entities are made up of physicians or osteopaths.

In this case, it also appears that services performed by allergists are also provided by other physicians. For example, as plaintiffs point out, the IPA fee schedule sets a price for an initial exam as well as office visits, which schedule applies to all physicians (IPA Fee Schedule.) Moreover, there is no question but that general practitioners see patients for many of the same ailments that an allergist might treat. Finally, at least one of the tests mentioned above that plaintiffs perform on all asthmatic patients, the pulmonary function studies, is also performed by other specialists, including cardiologists.

*b. Is IPA a Legitimate Joint Venture?*

Defendants argue that the *per se* rule against price fixing does not apply in this case because IPA is a legitimate joint venture. Certain types of anticompetitive behavior are analyzed under the *per se* rule so that neither competitive purpose nor effect of the conduct is examined; proof that the conduct, in fact, occurred is sufficient.[27] Because of the harshness of the *per se* rule, however, the Supreme Court has limited its application to those restraints "for which no elaborate study of an industry is needed to establish that their nature and effect is 'plainly' or 'manifestly' anti-competitive." ANTITRUST LAW DEVELOPMENTS, *supra* at 22 (citing *Broadcast Music, Inc. v. Columbia Broadcasting Sys. Inc.*, 441 U.S. 1, 8, 99 S.Ct. 1551, 1556, 60 L.Ed.2d 1 (1979). "It is only after considerable experience with certain business relationships that courts classify them as *per se* violations of the Sherman Act." *United States v. Topco Assocs.*, 405 U.S. 596, 607–08, 92 S.Ct. 1126, 1133, 31 L.Ed.2d 515 (1972).[28]

27. ANTITRUST LAW DEVELOPMENTS, *supra* n. 20 at 22.

28. Once experience with a particular kind of restraint enables the Court to predict with confidence that the rule of reason will condemn it, it has applied a conclusive presumption that the restraint is unreasonable. For the sake of business certainty and litigation efficiency, we have tolerated the invalidation of some agreements that a full blown inquiry might have proved to be reasonable.

In *Standard Oil Co. v. United States,* 221 U.S. 1, 31 S.Ct. 502, 55 L.Ed. 619 (1911), the Supreme Court held that price fixing agreements between competitors were unlawful *per se.* The Court has consistently adhered to this. *See, e.g., United States v. Socony–Vacuum Oil Co.,* 310 U.S. 150, 60 S.Ct. 1811, 84 L.Ed. 1129 (1940); *Maricopa,* 457 U.S. at 348, 102 S.Ct. at 2475. In *Maricopa,* the court rejected an argument that the rule should not be applied because courts had little antitrust experience in the health care industry: "whatever may be its peculiar problems and characteristics, the Sherman Act, so far as price fixing agreements are concerned, establishes one uniform rule applicable to all industries alike." *Id.* (quoting *Socony,* 310 U.S. at 222, 60 S.Ct. at 843). (emphasis added.) *See also National Collegiate Athletic Association v. Board of Regents of the University of Oklahoma (NCCA),* 468 U.S. 85, 104 S.Ct. 2948, 82 L.Ed.2d 70, note 21 (1984).

■ Not all agreements among competitors that have an impact on price are *per se* violations of the Sherman Act, however. Price fixing agreements can be lawful if they are a necessary part of an integration of resources—a joint venture. In *Broadcast Music Inc. v. Columbia Broadcasting,* 441 U.S. 1, 23, 99 S.Ct. 1551, 1564, 60 L.Ed.2d 1 (1979), the Supreme Court stated that

> Not all arrangements among actual or potential competitors that have an impact on price are per se violations ... or even unreasonable restraints.... *Joint ventures and other cooperative arrangements* are ... not usually unlawful, at least not as price-fixing schemes, where the agreement on price is necessary to market the product at all.[29]

*Maricopa,* 457 U.S. at 344, 102 S.Ct. at 2473. This experience "is normally provided by a history of cases involving a particular type of challenged conduct in which application of the rule of reason has almost always resulted in a finding of anticompetitive effect." ANTITRUST LAW DEVELOPMENTS, *supra,* at 22.

**29.** In *Broadcast Music,* the Court held that the rule of reason should be applied to test the

To determine whether such is to be characterized as *per se* unlawful, the Court stated that the inquiry must focus on the purpose and effect of the conduct.

In *Arizona v. Maricopa County Medical Society,* 457 U.S. 332, 102 S.Ct. 2466, 73 L.Ed.2d 48 the respondents attempted to rely on *Broadcast Music* to argue that their fee schedules involved price fixing in only a literal sense. The Court disagreed, stating:

> Each of the [medical] foundations is composed of individual practitioners who compete with one another for patients. Neither the foundations nor the doctors sell insurance, and they derive no profits from the sale of health insurance policies. The members of the foundations sell medical services. Their combination in the form of the foundation does not permit them to sell any different product [unlike the case in *Broadcast Music* in which the combination was necessary to creating a new product—the blanket license]. Their combination has merely permitted them to sell their services to certain customers at fixed prices and arguably to affect the prevailing market price of medical care.

*Id.* at 356, 102 S.Ct. at 2479.

The Court found that the foundations were not analogous to joint ventures in which persons who would otherwise be competitors pool their capital and share the risks and are regarded as just another competitor in a market with a number of sellers. In *Maricopa,* the agreement between hundreds of competing doctors concerned the price that each would charge to the community. *Id.* at 339 and 357, 102 S.Ct. at 2470 and 2479. That is substantially different from the case here, in which the plan only sets a maximum fee for what IPA member physicians can charge Health Plus mem-

legality of "blanket" music performance licenses offered by copyright holders who had joined in a joint venture to market the licenses.

This was essentially the holding in *NCAA,* 468 U.S. at 101, 104 S.Ct. at 2960, in which the Court wrote: "[w]hat is critical is that this case involves an industry in which horizontal restraints on competition are essential if the product is to be available at all."

bers.[30] It does not dictate what those doctors can charge nonHealth Plus patients, including those patients belonging to competing health carriers.[31]

In this case, Health Plus is a health maintenance organization organized under 42 U.S.C. § 300e. IPA offers complete physician coverage to Health Plus members for a flat capitation payment, and Health Plus offers complete "medical coverage" to its members for a flat premium. The facts also indicate that IPA member physicians share the risks of loss as well as the opportunities for profit by accepting a capitation payment from Health Plus, unlike the physicians in *Maricopa.*[32] *See Maricopa* at 340, 102 S.Ct. at 2470. Gerald Landgraf stated in his affidavit at paragraphs 10, 11 and 12 that:

> All members of IPA have faced the risk of non-payment of 15%, and, later 12% of their total fees for treatment of Health Plus members. These amounts are withheld by IPA (the "risk withhold") and are ultimately paid only if IPA's level of expenses permit payment. IPA members also share in any surplus earned by the organization if capitation payments exceed IPA's expenses. Additionally, individual Primary Provider Groups "PPGs" within IPA have risked non-payment of up to 25% of their fees, and individual physicians up to 50%, should

their expenses exceed the capitation payments made to them.

> These risks have been very real. Some physicians and PPGs have lost the entire amount at risk in particular years, because their expenses exceeded the capitation payments made to them. During one year, all members of the IPA faced a delay in receiving funds from their risk withhold.

> Of course, this risk was significant even during the years that the fund was paid. If IPA had not been successful in containing costs, much greater amounts would have been lost by IPA members. IPA members undertook the significant risk that IPA would not be successful when they put their fees at risk in joining the IPA. Because of the competitive market in which Health Plus operates, IPA cannot avoid this risk by shifting costs to patients.

Moreover, IPA shares in Health Plus's risk of loss. Landgraf Dep. at 72–76.[33]

Although plaintiffs argue that there was no real risk borne by IPA members because Health Plus can shift the costs to subscribers, they offer no evidence to demonstrate this fact especially in light of Landgraf's above-cited statement that in the competitive market, costs cannot be shifted to subscribers. Moreover, they

---

**30.** The Court contrasted the facts in *Maricopa* with HMOs.

> An alternative to the fee-for-service type of insurance plan is illustrated by the health maintenance organizations authorized under the Health Maintenance Organization Act of 1973, 42 U.S.C. § 300e *et seq*.... Under this form of prepaid health plan, the consumer pays a fixed periodic fee to a functionally integrated group of doctors in exchange for the group's agreement to provide any medical treatment that the subscriber might need. The economic risk is thus borne by the doctors.

*Id.* at 339 n. 7, 102 S.Ct. at 2470 n. 7.

**31.** Being a member of IPA means only that a physician can offer his services to Health Plus members and not that he cannot provide services to patients who are not members of Health Plus. (Lynk Aff. ¶ 13.) Moreover, "IPA physicians are free to accept affiliation with any other health care financing organization, without forfeiting their IPA membership." (*Id.* ¶ 15.)

**32.** Unlike traditional fee-for-service systems, in which there is incentive to provide greater amounts of service, Health Plus provides a set fee payment to the IPA which remains constant regardless of the actual utilization of service. This provides a strong incentive to stop overutilization. This was not the case in *Maricopa.* In that case the foundations, unlike Health Plus, did not insure risks themselves—rather, the insurance companies did. In essence, the foundations acted as the insurance companies' claims agents on a contract basis.

> They administer the claims and, to some extent, review the medical necessity and propriety of the treatment for which a claim is entered.

*Id.* at 359 n. 3, 102 S.Ct. at 2481 n. 3.

**33.** Unlike the facts presented in *Maricopa,* Health Plus and IPA share any deficit or surplus that results from the provision of non-physician services.

suggest that the "risk withhold" has never been lost. This misses the point. Just because the risk does not materialize does not mean that it is not real. Plaintiffs offer no evidence that the risk of loss was not real.[34]

The other element required by *Broadcast Music* and *Maricopa* is that competitors come together and create a new product and that establishing a price is a necessary consequence of creating the new product. In *Maricopa,* the Court rejected an argument that the foundations had created a new product in that case, stating:

> The members of the foundations sell medical services. Their combination in the foundation does not permit them to sell any different product. Their combination has merely permitted them to sell their services to certain customers at fixed prices and arguably to affect the prevailing market price of medical care.

*Id.* at 356, 102 S.Ct. at 2479.

In *Maricopa,* the foundations performed three basic functions: (1) they set the schedule of maximum fees; (2) they reviewed the medical necessity and appropriateness of treatment provided; and they drew checks on insurance company accounts to pay doctors for services performed for covered patients. *Id.* at 339–40, 102 S.Ct. at 2470–71. As mentioned above, the foundations acted as a claims agent for insurance companies.

In this case, Health Plus, unlike the foundations in *Maricopa,* is the insurance company. However, unlike other insurance plans which merely underwrite insurance, Health Plus underwrites and arranges for a comprehensive range of health services for a fixed premium from the consumer. It and IPA undertake the risks that costs may exceed premiums. In the IPA model HMO, services are provided by the offices of participating physicians, and subscribers are free to choose from a wide range of physicians. (Hurst Aff.) Consumers have been provided with a new product: guaranteed comprehensive physician services for a prepaid premium different from fee-for-service physician services. (Landgraf Dep. at

12.) The maximum price agreement is a method of distributing proceeds as well as a way of keeping losses down in order to remain competitive. Thus, the *per se* rule of illegality does not apply to the situation here presented.

### 3. Does Plaintiffs' Claim Fail Under the Rule of Reason?

■ In *Standard Oil Co. of New Jersey v. United States,* 221 U.S. 1, 31 S.Ct. 502, 55 L.Ed. 619 (1911), the Supreme Court fashioned the rule of reason as a means of determining what restraints are unreasonable. Under the rule of reason, the burden of proving that the restraints are unreasonable rests on the plaintiff. *See, e.g., United States v. Arnold, Schwinn & Co.,* 388 U.S. 365, 87 S.Ct. 1856, 18 L.Ed.2d 1249 (1967). In *Continental T.V., Inc. v. GTE,* 433 U.S. 36, 49, 97 S.Ct. 2549, 2557, 53 L.Ed.2d 568 (1977), the Supreme Court stated that under the rule of reason, "the factfinder weighs all the circumstances of a case in deciding whether a restrictive practice should be prohibited as imposing an unreasonable restraint on competition." The basic inquiry under the rule of reason is limited to whether the restraint in question "is one that promotes competition or one that suppresses competition." *National Society of Professional Engineers v. United States,* 435 U.S. 679, 691, 98 S.Ct. 1355, 1365, 55 L.Ed.2d 637 (1978). This inquiry is "confined to a consideration of impact on competitive conditions." *Id.* at 690, 98 S.Ct. at 1364.

Defendants argue that plaintiffs cannot claim a rule of reason violation because plaintiffs possess no theory of anticompetitive effect as a result of the IPA reimbursement schedule. Plaintiffs made their assertion clear at the hearing on these motions, that IPA had set maximum reimbursement levels below competitive levels. Even if this is true, however, plaintiffs offer no evidence as to what impact the agreement had on competitive levels. The reimbursement schedule is not a price charged to consumers, but is more properly

---

**34.** In fact, payments have been withheld and lost in some years. (See Landgraf Aff. ¶ 11.)

characterized as a method of distributing revenues from the HMO to IPA members.[35] In fact, the undisputed facts set out above indicate that prices charged—that is, the premiums charged to subscribers—are determined in a competitive market. In the case of Health Plus's biggest subscriber, General Motors, prices have even fallen.

Plaintiffs contend that determining whether competition is harmed is a question of fact based on the relevant market, the competitive impact of fixed fees, market power and motive. Although plaintiffs contend that the relevant market is prepaid health services, this is not supported in the record. Moreover, the relevant market "consists of the ... services with which defendants' product competes," *Paschall,* 695 F.2d 322, 326 n. 3 (8th Cir.1982). In this case, the market is health care financing.[36]

As to the impact of the price agreement, plaintiffs contend that the fee schedule had the "effect of stabilizing or increasing prices ..." (Lynk Dep.Ex. 39. [Letter from Marc L. Fleischaker to David Ettinger, March 11, 1986]). Plaintiffs state that their assertion is supported by a dramatic rise in allergy fees paid by IPA after plaintiffs' termination or resignation. However, plaintiffs merely refer to a letter from their attorney to defendants' attorney. Moreover, the allergy fees paid by IPA after plaintiffs left IPA is irrelevant without some connection to its effect on competition. Plaintiffs also contend that the pricing restraint is spread to the entire Flint area through reminders to charge the same fees to nonHealth Plus patients as the reimbursement schedule provides for Health Plus patients. Plaintiffs rely on a January 1981 IPA Bulletin which, on page 3, announced the 1981 maximum Fee Schedule. IPA members were reminded that their agreement with IPA called for billing IPA

at a rate consistent with that charged, up to the maximum level, to private paying patients and other health insurers. This does not support plaintiffs' argument; it just indicates that merely because there was a maximum reimbursement allowable, IPA members should not automatically charge that amount on the sole basis that the patient is a Health Plus subscriber.

Finally, plaintiffs maintain that they have shown that defendants' motives are disputed. Plaintiffs rely on *FTC v. Indiana Federation of Dentists,* 476 U.S. 447, 106 S.Ct. 2009, 90 L.Ed.2d 445 (1986), for the proposition that when anticompetitive motives are present and no clear competitive benefits exist, an extended market analysis is unnecessary. Unfortunately, plaintiffs do not present any evidence of anticompetitive motive that defendants must have in fixing prices.

Thus, plaintiffs' price fixing claim under § 1 of the Sherman Act must be DISMISSED.

## C. SHOULD PLAINTIFFS' GROUP BOYCOTT CLAIM BE DISMISSED?

### 1. Was There A Conspiracy?

To prevail under Section 1 of the Sherman Act, a plaintiff must establish a "contract, combination ... or conspiracy." 15 U.S.C. § 1. Regardless of the purpose or effect on competition, Section 1 does not prohibit individual business actions and decisions by a single entity. *ANTITRUST LAW DEVELOPMENTS, supra* n. 20 at 2. Defendants argue that although plaintiffs allege in Count II of the Complaint that they were excluded from IPA because of a conspiracy between IPA, Health Plus, Landgraf and Van Duyne, the evidence shows that Health Plus had no role in the dispute with plaintiffs (Landgraf October Dep. at 12) and that Van Duyne and Land-

**35.** Obviously, if the maximum levels were too high, costs would exceed revenues from Health Plus customers. In that situation, IPA members would lose their "risk withhold" and/or be forced to raise prices to consumers.

This is not like the facts in *Maricopa, supra* in which the prices fixed were the prices charged to the consumer.

**36.** Plaintiffs also maintain that there is a question as to the definitions of the markets in which plaintiffs compete. Plaintiffs argue that their competitors include other allergy specialists and not general practitioners performing allergy services. Even if plaintiffs' competitors were limited to specialists, plaintiffs fail to indicate how this is relevant to the competitive impact on price.

graf, who served IPA as staff members pursuant to an administrative service contract with IPA, cannot as a matter of law be held to have conspired with IPA. In essence, they claim that the defendants are all one entity.

Defendants rely on *Smith v. Northern Michigan Hospitals, Inc.*, 703 F.2d 942 (6th Cir.1983), which held that members of an integrated clinic could not conspire with themselves. The plaintiffs in that case had complained that defendants' referral system, in which emergency room patients would be referred to on-call physicians at defendant Hospital if they did not have a doctor in the community, was a violation of Section 1. The Court stated that nothing in the record established that defendant Hospital had anything to do with referrals.

> There is nothing in the present record to indicate that the alleged abuses of the referral system were, if they occurred, anything other than the result of unilateral actions by individuals in the emergency room.

*Id.* at 950.

Moreover, the court found that emergency room staff members could not conspire with specialists of the same company or group practice. The court did, however, distinguish that case from cases involving incorporated associations of independent physician members created to provide health care insurance programs.

> These corporate entities serve purposes other than actual physical delivery of health care services by member physicians. Each participating physician in the incorporated association maintained the actual practice of their profession independent of that corporate body.

*Id.* at 951 n. 16.[37]

In this case, like the exception in *Smith*, each physician in IPA has a practice or other profession independent of IPA or Health Plus. The inferences from the undisputed facts lead the Court to the conclusion that there is at least a question of fact as to whether there was a conspiracy to exclude plaintiffs from IPA. First, Health Plus was created by physicians, the Genesee County Medical Society, who are members of IPA. Moreover, although IPA members may not dominate the Health Plus Board of Directors, one third of its members belong to IPA (1984 Articles and Bylaws of Health Plus; Memorandum on Election Procedures (Ex. 4)). Moreover, the original board was selected by the Genesee County Medical Society. Since the board members are nominated by the Health Plus Executive Committee, which is selected by the existing Board, and elected by the Health Plus Board, there is at least an inference which must be viewed in a light most favorable to plaintiffs, that IPA members have effective control.[38] Additionally, both defendants Landgraf and Van Duyne are employed by IPA and Health Plus and Van Duyne, who was president of IPA, was active in the events involving plaintiffs. (Van Duyne Dep. at 13, 22, 33.) Finally, the committee members, who are unnamed conspirators, had practices outside their IPA participation.

## 2. Is There a Per Se Violation?

Defendants next argue that *Northwest Wholesale Stationers, Inc. v. Pacific Stationary Printing, Co.*, 472 U.S. 284, 105 S.Ct. 2613, 86 L.Ed.2d 202 (1985) precludes treatment of this case under the *per se* illegal group boycott rule. Group boycotts or concerted refusals by traders to deal with other traders have long been forbidden; *see, e.g., Klor's, Inc. v. Broadway-*

---

**37.** *See also Hoffman v. Delta Dental Plan of Minn.*, 517 F.Supp. 564 (D.Minn.1981).
> We reject defendants' argument that Delta, as a single entity, is not a horizontal competitor.... Because of the member control of Delta as evidenced by member domination of the Delta board of directors, the fact that membership is exclusively composed of participating dentists, and the creation of Delta by the Minnesota Dental Association, we con-

> clude that the existence of concerted action is not precluded as a matter of law.... Moreover, because of member control of Delta, Delta can be considered the agent of its members. Thus, the requirement that the alleged conspirators be horizontal competitors of the injured party is also satisfied.

**38.** *See Pa. Dental Ass'n, supra* n. 25 at 257 and n. 5.

*Hale Stores, Inc.,* 359 U.S. 207, 79 S.Ct. 705, 3 L.Ed.2d 741 (1959); *Silver v. NYSE,* 373 U.S. 341, 83 S.Ct. 1246, 10 L.Ed.2d 389 (1963), and the Supreme Court has held that concerted refusals to deal, or group boycotts, are so likely to restrict competition without any offsetting efficiency gains that they should be condemned as *per se* violations of § 1. *See Klor's,* 359 U.S. 207, 79 S.Ct. 705.

" 'Group boycotts' are often listed among the classes of economic activity that merit *per se* invalidation under § 1.... [But] exactly what types of activity fall within the forbidden category are, however, far from certain.... Some care is therefore necessary in defining the category of concerted refusals to deal that mandate *per se* condemnation." [39] *Northwest Wholesale Stationers,* 472 U.S. 284 at 293, 105 S.Ct. 2613 at 2619, 86 L.Ed.2d 202 at 211. In *Northwest Wholesale Stationers,* the Supreme Court dealt with the issues of whether a *per se* violation occurred when a cooperative buying agency expelled a member without procedural means for challenging the expulsion and when a *per se* analysis is applied to joint activities susceptible to being called concerted refusals to deal.[40] The Court stated in general that cases given the *per se* approach "generally involved joint efforts by a firm or firms to disadvantage competitors by 'either directly denying or persuading or coercing suppliers or customers to deny relationships the competitors need in the competitive struggle.' " *Id.* at 293, 105 S.Ct. at 2619, 86 L.Ed.2d at 211. The cases cited by the Court involved boycotts which

cut off access to a supply, facility, or market necessary to enable the boycotted firm to compete ... and frequently the boycotting firms possessed a dominant position in the relevant market.... In addition, the practices were generally *not justified by plausible arguments* that were intended *to enhance overall efficiency and make markets more competitive.*

Under such circumstances the likelihood of anticompetitive effects is clear and the possibility of countervailing procompetitive effects is remote.

*Id.* (emphasis added.)

Thus, the court in *Northwest Wholesalers* required that those plaintiffs seeking application of the *per se* rule to the challenged activity which is likely to have predominately anticompetitive effects, make a threshold showing

(1) whether that practice is [not] justified by plausible arguments that it is intended to enhance overall efficiency and make markets more competitive; and

(2) a showing that defendant possesses—

  (a) market power, and

  (b) exclusive access to an element essential to effective competition.[41]

The Court in *Northwest* did indicate that [a]lthough a concerted refusal to deal need not necessarily possess all of these traits to merit *per se* treatment, not every cooperative activity involving a restraint or exclusion will share with the *per se* forbidden boycotts the likelihood of predominantly anticompetitive consequences.

**39.** "[T]he category of restraints classed as group boycotts is not to be expanded indiscriminately, and the *per se* approach has generally been limited to cases in which firms with market power boycott suppliers or customers in order to discourage them from doing business with a competitor...." *FTC v. Indiana Federation of Dentists,* 476 U.S. 447, 459, 106 S.Ct. 2009, 2018, 90 L.Ed.2d 445 (1986).

**40.** Northwest was a purchasing cooperative of approximately 100 office supply retailers which acted as a primary wholesaler for the retailers. In 1978, members of Northwest voted to expel Pacific, offering no explanation at the time nor giving Pacific notice, a hearing, or any other

opportunity to challenge the decision. Pacific contended that the expulsion was a group boycott and a *per se* violation of § 1.

**41.** Although defendants contend that there is an additional element, that a defendant must act to disadvantage competitors, this is at most a part of the third element. "Cases to which this Court has applied the *per se* approach have generally involved joint efforts ... to *disadvantage* competitors by 'either directly denying or persuading or coercing suppliers or customers to deny relationships the competitors need in the competitive struggle.' " *Id.* at 294, 105 S.Ct. at 2619, 86 L.Ed.2d at 211.

*Id.* at 295, 105 S.Ct. at 2620, 86 L.Ed.2d at 212.

### a. IPA's Actions Are Justified

■ The Court agrees with defendants that the acts of expulsion and the refusal to readmit plaintiffs are justified by enhancing efficiency and making the market more competitive. First, despite plaintiffs' counsel's contentions at the hearing, the record shows that plaintiffs do not dispute the fact that IPA adopted its allergy testing policy to prevent excessive use of costly tests and that plaintiffs disagreed with this policy. (*See* Statement of Facts.) It is also undisputed that cost containment objectives are procompetitive. As defendants state: "If an HMO utilizes physicians who disagree with its philosophy of cost containment, that philosophy cannot be realized. Thus, refusing to deal with physicians whose methods differ from those preferred by HMO can be procompetitive." [42]

Although plaintiffs contend that defendants' decisions or policies as to allergy testing were incorrect, that is irrelevant. The issue is not whether the decisions were correct but "whether there are plausible arguments that they were intended to enhance overall efficiency and make markets more competitive." *Northwest,* 472 U.S. 284 at 294, 105 S.Ct. 2613 at 2619, 86 L.Ed.2d 202 at 211. Moreover, plaintiffs contend that the exclusions were not intended to be procompetitive because, almost contemporaneously with plaintiffs' termination, IPA's fee for an allergy survey was increased. This too is irrelevant. The dispute with plaintiffs was not over the fee reimbursement amount, but concerned plaintiffs' overutilization of tests. Finally, plaintiffs contend that the decision to deny membership to plaintiffs was made by primary care physicians who were interested in providing allergy care themselves. Not only is there no evidence of this,[43] but allegations that defendants' motives were manifestly anticompetitive are more properly considered under a rule of reason analysis. *See Goss v. Memorial Hospital System,* 789 F.2d 353, 355 n. 3 (5th Cir. 1986) (quoting *Northwest,* 472 U.S. at 296 n. 7, 105 S.Ct. at 2620 n. 7, 86 L.Ed.2d at 212 n. 7.)

### b. Defendants Do Not Possess Market Power

■ Both parties agree that defendants have 20% of the patients in the tri-county area. They disagree, however, over whether that amount is sufficient market power under *Northwest.* Case law, although not dealing with group boycotts, appears to support defendants' assertion that a 20% market share is not sufficient market power in light of the competition from other providers in the relevant market.[44] *Jefferson Parish Hosp. Dist. No. 2 v. Hyde,* 466 U.S. 2, 104 S.Ct. 1551, 80 L.Ed.2d 2 (1984); *Assam Drug Co., Inc. v. Miller Brewing Co., Inc.,* 624 F.Supp. 411, 414 (S.D.W.Va. 1985) (Miller's share was 19.1%, whereas Anheuser–Busch and Stroh's possessed market shares of 30.5% and 22.7% respectively).[45] However, market share does not always indicate whether a firm really has market power. Therefore, other factors must also be examined and these support defendants' position.[46]

---

**42.** Even plaintiffs' expert testified that if a plan deals only with selected physicians whose methods suit a PPO's aims, it could benefit by receiving the lowest bids and, by operating in this manner, can be procompetitive. (Leonard Dep. at 980.)

**43.** In fact, when asked if he had any evidence of any primary care physicians gaining as a result of the plaintiffs' leaving the IPA, plaintiffs' expert testified that "[he didn't] know what happened to the Hassans' patients." (Leonard Dep. at 1005.)

**44.** Plaintiffs do not dispute that Blue Cross has a greater market share. (Landgraf July 11 Dep. at 12–13.)

**45.** Plaintiffs do not cite any case law for their position but, rather, rely on L. Sullivan, *Handbook of the Law of Antitrust,* (1977), the referenced page of which does not support their position.

**46.** "Market share is just a way of estimating market power, which is the ultimate consideration. When there are better ways to estimate market power, the court should use them." *Ball,* 784 F.3d at 1336 (citing *United States v. General Dynamics Corp.,* 415 U.S. 486, 94 S.Ct. 1186, 39 L.Ed.2d 530 (1974).

First, there are no significant barriers to entry into this market—that is, the market for health care finance.[47] In *Ball Memorial Hosp., Inc. v. Mutual Hosp. Ins.*, 784 F.2d 1325, 1335 (6th Cir.1986), the Seventh Circuit stated that:

> The insurance industry is not like the steel industry, in which a firm must take years to build a costly plant before having anything to sell. The "productive asset" of the insurance business is money, which may be supplied on a moment's notice, plus the ability to spread risk, which many firms possess and which has no geographic boundary. *Cf. Hood v. Tenneco Texas Life Ins. Co.*, 739 F.2d 1012, 1019 (5th Cir.1984) (insurance industry marked by ease of entry).

In this case, defendants' expert has stated in his affidavit that any health care insurer in Michigan may serve patients in this market. (Lynk Aff. ¶ 5.) Plaintiffs have not identified any barriers to entry and, in fact, Greater Flint HMO and PPO, Trust, have recently entered the market.

Next, as defendants assert, there is no indication that defendants can impose prices beyond what is possible in a competitive market without losing business to existing or new competitors. For example, in order to remain attractive to General Motors employees, Health Plus recently decreased its prices. (Landgraf Aff. ¶ 4.) GM's open enrollment process has been described as unusually competitive even by plaintiffs' expert. (Leonard Dep. at 729.)

Plaintiffs, however, argue that defendants have market power through the percentage of physicians (75%) in this market who are members of IPA.[48] Plaintiffs have no case law to support this position. The authority they cite does not apply because it is concerned with a different problem—that of deterring the establishment of new HMOs. Those concerns would only come into play if IPA was able to affiliate with physicians on an exclusive basis.[49] There is simply nothing in the record to indicate that IPA physicians are not free to affiliate with other providers. (Smalley Dep. at 273, 275). Moreover, just because defendants may have a large percentage of physicians as members, that does not indicate market power because it says nothing about barriers to entry[50] or defendants' ability to raise prices without a response from competitors. Accordingly, plaintiffs are not entitled to a finding of *per se* illegality.

### 3. Rule of Reason

■ Defendants next contend that there is no unreasonable restraint of trade as no significant anticompetitive effect has resulted from the plaintiffs' expulsion or resignation, and subsequent rejection for readmittance, from IPA. The test under the rule of reason is whether competition in the overall market has been harmed, the antitrust laws not having been intended to protect merely individual competitors. *Davis–Watkins Co. v. Service Merchandise*, 686 F.2d 1190, 1202 (6th Cir.1982) ("Rule of reason analysis requires a showing of anticompetitive market effect by the plaintiff"). In order to show an anticompetitive market effect, the defendant must

**47.** Although plaintiffs contend that the relevant market is the "prepaid market share," which includes only HMOs, the relevant market "consists of the ... services with which defendants' product competes." *Paschall v. Kansas City Star Co.*, 695 F.2d 322, 326 n. 3 (8th Cir.1982), *rev'd on other grounds*, 727 F.2d 692 (8th Cir.) (en banc), *cert. denied*, 469 U.S. 872, 105 S.Ct. 222, 83 L.Ed.2d 152 (1984). In this case, Health Plus must compete with other sources of health care financing. Even plaintiffs' economic expert admitted that in the Flint area HMOs compete with other non-prepaid health care finance organizations. (Leonard Dep. at 609.) Moreover, although he opined that an HMO market existed and even that a submarket for HMOs existed for those who strongly prefer HMOs, he had no

facts to support this. (Leonard Dep. at 600–610.)

**48.** Defendants, on the other hand, contend that the correct percentage of physicians affiliated with IPA is 60%. (Lynk Aff. ¶ 12.)

**49.** Remarks of J. McGrath before the 33d Annual American Bar Association Antitrust Spring Meeting, 8–10 (March 27, 1985). *See also* Letter from William Baxter, Attorney General to Donald W. Fish (Sept. 21, 1983, plaintiffs Ex. 15); 46 Fed.Reg. 48, 991.

**50.** If there was exclusive affiliation, there would be a barrier to entry.

have *significant market power* in the relevant market. *Id.*[51] Moreover, at least one case relied on by the Sixth Circuit in *Davis–Watkins* found that in order to prove a violation of § 1 the plaintiff would have to show that the practice enhanced the defendants' market power or put it in a position in which it could harm competition. *Oreck v. Whirlpool Corp.*, 579 F.2d 126, 130 n. 5 (2d Cir.1978) (en banc), *cert. denied,* 439 U.S. 946, 99 S.Ct. 340, 58 L.Ed.2d 338 (1979).

In this case, the undisputed facts indicate that there has been no anticompetitive impact on the overall market. First, as indicated above, IPA does not have significant market power. IPA, according to both parties, has approximately 20% of the patients in the relevant market. Moreover, IPA faces other large competitors and operates in an industry in which there are no significant barriers to entry. *See Ball,* 784 F.2d 1325. In addition, plaintiffs' economist has testified that defendants have not gained or increased their market power by excluding the Hassans. (Leonard Dep. at 1039.)

Even assuming that defendants did have the requisite market power, there is no evidence that the exclusion of plaintiffs had an impact on *overall* competition. In *Dunn & Mavis, Inc. v. Nu–Car Driveaway, Inc.*, 691 F.2d 241, 245 (6th Cir., 1982), the Sixth Circuit held that the plaintiff had not alleged facts suggesting that a refusal to deal had a significant anticompetitive effect because the substitution of one company for another "does not limit competition in any substantial sense."

This case presents the same situation. The plaintiffs' expulsion or departure from IPA was followed (or shortly preceded) by the admittance of two new allergists (Leonard Dep. at 1039). Thus, IPA replaced two competitors (plaintiffs) with two other competitors. Moreover, there is no indication that plaintiffs left the market, so the end result is that the public has just as many allergists from which to choose.[52] Even if the plaintiffs were to leave the tri-county market, there is no reason to believe that they would not be easily replaced so that the market would be served by enough allergists.[53]

Q. Is there anything out there in the way of a barrier to entry that would keep new physicians from coming into the three-county area to replace physicians who left?

A. Nothing except the barrier to entry that exists and the difficulties of establishing themselves in a new market.

. . . .

Q. What about ... allergists? Suppose the two Hassans left Flint, do you have any reason to doubt that they would be replaced by other allergists?

A. I don't know.

Finally, competition is not harmed because there are a sufficient number of allergists and primary care physicians who can provide allergy services in the tri-county area. (Lynk Aff. 17–20).[54] Thus, even if the plaintiffs left the relevant geographic mar-

---

**51.** *See also Valley Liquor v. Renfield Importers, Ltd.,* 678 F.2d 742, 745 (7th Cir.1982) ("A firm that has no market power is unlikely to adopt policies that disserve its consumers; it cannot afford to").

A part of this requirement is that where the rule of reason applies, it must show that the "defendants' conduct was reasonably calculated to prejudice the public interest." *Lamb Enterprises v. Toledo Blade Co.,* 461 F.2d 506, 517 (6th Cir.1972), *cert. denied,* 409 U.S. 1001, 93 S.Ct. 325, 34 L.Ed.2d 262 (1972).

**52.** Of course, Health Plus subscribers can still receive treatment from the plaintiffs, but Health Plus will not cover it.

**53.** *See Ball,* 784 F.2d 1325 (market power does not exist if entry is easy). Plaintiffs assert, without any evidence, that the "barriers to entry

... presented to an allergy specialist denied IPA membership are high indeed."

**54.** Although plaintiffs contend that "by driving plaintiffs from the market, defendants have decreased the availability of allergy specialty services," they present no evidence that this is true. In fact, they acknowledge in their response to defendants' motion for summary judgment that primary care physicians can perform allergy services. (Plaintiffs' Brief at 18.) Therefore, the public has not been harmed in that allergy services are still available not only from the plaintiffs, but also from other physicians as well. Plaintiffs make no claim that the quality of these services is not sufficient. *Lamb Enterprises,* 461 F.2d 506. Although the plaintiffs contend that "allergy specialists" are the relevant market, they do not have any evidence. In fact, plaintiffs' economist has testified that their

ket, there are a sufficient number of physicians to take their places, thereby serving the public and preserving competition.[55]

Plaintiffs contend that Health Plus has successfully preempted other new prepaid health plan entrants. Not only is there no evidence presented to support this claim, but it also assumes that prepaid health plans are the relevant market participant, an argument which has already been rejected. Next, plaintiffs claim that defendants' motives in excluding plaintiffs from IPA were anticompetitive.[56] Plaintiffs present no evidence of an anticompetitive motive other than that several doctors, primary care physicians who were involved in the decision stood to benefit from plaintiffs' exclusion. Not only does this ignore the fact that several allergists were admitted shortly before and after plaintiffs' expulsion, but it also ignores the rule of reason's requirement of injury to overall competition, not just to individual competitors. Thus, plaintiffs have failed to satisfy the requirements under the rule of reason.

### D. MUST PLAINTIFF'S TORTIOUS INTERFERENCE WITH AN ECONOMIC ADVANTAGE CLAIM ALSO BE DISMISSED?

█ Count IV of plaintiffs' complaint states that:

35. Defendants did knowingly, willfully, wantonly and without privilege interfere with plaintiffs' economic relations with [Health Plus] member patients and cause said patients to cease dealing with plaintiffs and seek treatment from competing physicians. Defendants further prevented other physicians from referring [Health Plus] patients to plaintiffs.

In *Weitting v. McFeeters*, 104 Mich.App. 188, 197, 304 N.W.2d 525 (1981), a panel of the Michigan Court of Appeals held that in order for interference with a business relationship to be tortious, it must be both intentional and improper. Thus, impropriety exists only when defendants' interference is "illegal, unethical or fraudulent." *Id.* at 198, 304 N.W.2d 525.[57] *See also Trepel v. Pontiac Osteopathic Hosp.*, 135 Mich.App. 361, 374–75, 354 N.W.2d 341 (1984). In this case, plaintiffs rely on the alleged antitrust violations as evidence of the existence of illegal interference. (*See* plaintiffs' Responsive Brief n. 19.) However, because plaintiffs' antitrust claims fail, so do their claims of intentional interference.[58] Thus, plaintiffs' tortious interference claim must also be DISMISSED.

Having disposed of all plaintiffs' claims, judgment in this case shall hereby be entered for defendants pursuant to Rule 56, Fed.R.Civ.P.

SO ORDERED.

competitors are not specialists (Leonard Dep. 627) and that primary care physicians are in the same product market. (Leonard Dep. at 632–3.) Moreover, plaintiffs are still in the relevant market so there is the same amount of allergy specialty services available.

55. Affiant Lynk stated that "Health Plus ... authorizes for allergy testing and reimbursement not only two board-certified or board-eligible allergists [Drs. Tanhehco and Cookingham] but twenty other physicians as well [which illustrates] the range of competitive alternatives available in the allergy services market." (Aff. at 20 n. 16.)

56. Plaintiffs rely on *FTC v. Indiana Federation of Dentists*, 476 U.S. 447, 106 S.Ct. 2009, 90 L.Ed.2d 445 (1986) for the proposition that "where clear anticompetitive motives are present and no clear competitive benefits exist, an extended market analysis is not required."

57. The Court relied on 4 Restatement Torts, 2d § 766B.

58. Moreover, plaintiff's claim for exemplary damages, that is, damages for mental and physical anguish and humiliation, must also be dismissed. It is well established "that one who commits the tort of intentionally interfering with another's business relations is subject to liability for 'pecuniary damages.' ... Exemplary damages are ordinarily inappropriate in commercial contexts...." *Cf. Kewin v. Massachusetts Mutual Life Ins. Co.*, 409 Mich. 401, 295 N.W.2d 50 (1980); *Getman v. Mathews*, 125 Mich.App. 245, 249, 335 N.W.2d 671 (1983). Although plaintiffs allege that defendants' conduct was especially egregious and was undertaken with the knowledge it would cause plaintiffs significant personal distress, they offer no supporting evidence.